WILLIAM B. RICE, THIRD, & others[1] *vs.* S. LINCOLN PRICE
& others.

Suffolk.    January 7, 1960. — March 9, 1960.

Present: WILKINS, C.J., WILLIAMS, COUNIHAN, WHITTEMORE, &
CUTTER, JJ.

*Deceit.  Damages,* For tort, For deceit.  *Proximate Cause.  Corporation,*
Organization, Corporate entity.

Discussion of the "benefit of the bargain" rule and the "out of pocket"
rule for damages in actions for deceit.  [507–511]
In an action for deceit, where it appeared that false representations by the
defendant to the plaintiffs concerning a certain electric heater induced
the plaintiffs to undertake a distributorship of the heater and to form
a corporation to conduct it, which venture failed because the heater
was not as represented, there was in the circumstances no error in
awarding the plaintiffs as damages losses suffered by them, respectively,
as a result of the misrepresentations consisting of amounts by which
their incomes during the period of the venture were less than what
they would have earned in former occupations given up by them, sums
invested by them in stock of the corporation, and sums, never repaid
to them, which they lent to the corporation and spent in paying its
debts.  [505–506, 511]
Where it appeared, in an action for deceit by two individuals and a cor-
poration against an individual and a corporation, that in negotiations
among the individuals false representations by the individual defend-
ant concerning a certain electric heater induced the individual plain-
tiffs to undertake a distributorship of the heater, that as part of the
arrangements agreed upon the plaintiff corporation, controlled by the
individual plaintiffs, was formed to conduct the distributorship and
the defendant corporation, controlled by the individual defendant, was
formed to sell the heaters to the plaintiff corporation as distributor,
and that the plaintiffs' venture failed because the heaters were not as
represented and the plaintiff corporation sustained a loss as a result
thereof, the misrepresentations properly could be found to have con-
tinued to be effective after the formation of the corporations in favor
of the plaintiff corporation as against the defendant corporation and to
be ground for holding the defendant corporation as well as the individ-
ual defendant liable to the plaintiff corporation for its loss.  [511–512]

[1] Dana L. Baldwin and Baldwin-Rice Corporation.

TORT. Writ in the Superior Court dated March 15, 1956. The action was heard by *Hudson, J.*

*Joseph G. Galligan, Jr.,* (*Charles J. Miller* with him,) for the defendants.

*Samuel Adams,* (*Robert F. Mooney* with him,) for the plaintiffs.

CUTTER, J. The plaintiffs seek in this action of deceit to recover damages caused by alleged misrepresentations. The defendants are (1) Price, a registered engineer and a graduate of a technical institution; (2) Acme Electric Heating Company (Acme); and (3) Lincoln Park Corporation (Lincoln Park). The individual plaintiffs, Rice and Baldwin, were officers and directors of the plaintiff Baldwin-Rice Corporation (Baldwin-Rice) which they formed to conduct the distributorship described below. The case was referred to an auditor. His report, with other evidence, was introduced before a judge of the Superior Court sitting without a jury. The trial judge found for Baldwin and Rice individually against Price and Acme, and for Baldwin-Rice against Price and Lincoln Park. The defendants moved to exclude the auditor's findings of damages. The bill of exceptions presents the questions whether the judge properly denied this motion and a motion for a new trial.

Findings of the following facts were warranted. Acme and Lincoln Park "were closely affiliated and Price . . . managed and controlled both corporations" and had a dominating influence over their officers, employees, and affairs. "[F]or all practical purposes . . . [these corporations] acted as one and were treated as one by Price." Price was fully authorized to negotiate and to enter into agreements for Acme.

Prior to 1955, Acme manufactured an electric steam heater. Late in 1954 Price designed and Acme manufactured an electric steamless heater, which possessed no patentable features. Each of these heaters used an electrically heated fluid commercially known as Dowtherm A, which had been used for producing heat "for many years prior to its use by Acme and Price."

From February 24, 1955, to April 4, 1955, Price negotiated with Baldwin, then a ceramics salesman, and Rice, then an insurance agent, in an attempt to interest them in undertaking the distribution of the steamless heater. "Neither Baldwin nor Rice then had any knowledge of or experience with electric heating." Price made various representations about the heater and its prospects and gave Baldwin and Rice advertising material applicable to both of Acme's heaters. Among other representations made by Price were (a) that the steamless heater for an input of one Kilowatt hour would produce heat amounting to 7,440 British thermal units (B.T.U.); (b) that the liquid used in the steamless heater was novel and that Acme and Price had been doing research on this; (c) that by its use "Acme increased heat output in its heaters"; (d) that Price had made application for a patent on these heaters; (e) that he would apply for the approval of the heater by Underwriters' Laboratories, Inc.; and (f) that the cost of operating these heaters was considerably less than the cost of operating comparable heaters using water as a heat emitting agency. The auditor found (1) that these representations were in substantial degree false and misleading; (2) that Acme and Price knew or should have known that this was so; (3) "that an input of 1,000 watts[2] could produce only 3,412" B.T.U.; (4) that these misrepresentations and others "were made . . . with an intent to induce Baldwin and Rice to . . . undertake the distribution . . . of . . . [the] heaters"; and (5) that Price and Acme made some of them as of their personal knowledge and that the others were susceptible of actual knowledge.

As a result of the conferences Price organized Lincoln Park and Baldwin and Rice organized Baldwin-Rice on April 4, 1955. By agreement among "all of the parties . . . entered into . . . about April 4, 1955, Acme was to manufacture the . . . heaters, and . . . Lincoln Park . . . was to sell them to" Baldwin-Rice which was to be "sole and

---

[2] The testimony before the court indicates that where the auditor refers to an input of 1,000 watts he. is referring to an input of one kilowatt hour (one KWH).

exclusive distributor" of the heaters for a year, with the right of renewal from year to year if it had purchased 5,500 heaters within one year, and no less than 7,280 units in each subsequent year. "This agreement contained no . . . representation . . . [or] statement relating to the efficiency or the performance of" the heaters. "Price was in complete charge of the manufacture of these heaters at Acme and the sales . . . by . . . Lincoln Park."

During a broadcast about April 19, 1955, "Price made a public announcement that these heaters had been able to do with less power and less time what up to then physicists had told him was impossible to do." Acme and Price approved advertising material prepared by Baldwin-Rice on the basis of the material furnished by Price and Acme.

The announcements and advertising elicited inquiries about "how these heaters were able to produce the results claimed . . . more particularly with reference to the [B.T.U.] output . . . and the low cost of operation." Distributors and others began to insist on outside proof about the B.T.U. output of the heaters and to complain about the lack of approval by Underwriters' Laboratories, Inc. The plaintiffs made demands upon Acme and Price to substantiate their representations. Tests were run for Acme, which "did not meet the questions asked," and later tests arranged by the plaintiffs in October, 1955, "proved that . . . [a] heater with an input of 1,000 watts could produce no more than 3,412" B.T.U. "As a result of this test and the continued failure of Acme and Price to substantiate the . . . representations . . . [Baldwin-Rice] was forced . . . out of business about January 1, 1956," about when Lincoln Park also ceased activities. These events, the auditor found, were caused by the fact that the "heaters did not possess the efficiency, performance and attributes . . . claimed for them by Acme and Price . . . and were not . . . better and could not be sold for more than any other electric heater of comparable size and wattage then on the market."

Baldwin resigned his former position about May 1, 1955, and during the forty-eight weeks of his work for Baldwin-

Rice received $3,840 less than he would have earned in his former occupation exclusive of certain allowances for life insurance premiums. He made a loan to, and paid debts of, Baldwin-Rice for which he never was repaid a balance of $2,690.23. Rice's loss of income, as a result of becoming an employee of Baldwin-Rice, was $2,200. He paid certain corporate loans and debts of which a "balance of $1,967.23 was never [re]paid to him." Baldwin and Rice each invested $1,000 in purchasing stock in Baldwin-Rice, which, the auditor found, sustained a loss of $28,871.67 (excluding certain sums owed to Baldwin and Rice).

The trial judge made findings (a) for Baldwin of $7,530.23 against Price and in the same amount against Acme; (b) for Rice of $5,167.23 against Price and in the same amount against Acme; and (c) of $28,871.67 for Baldwin-Rice against Price and in the same amount against Lincoln Park.

There was ample evidence that Price made misrepresentations of material facts, susceptible of actual knowledge, in order to induce the plaintiffs to undertake the distribution of the heaters and that the plaintiffs relied upon these misrepresentations and suffered damages as a consequence.[3] The defendants' principal contentions are that no recoverable damages have been shown as against any of the defendants and that the wrong measure of damages has been applied. It is further contended that Baldwin-Rice cannot recover at all against Lincoln Park or Price.

1. The trial judge stated, as the applicable measure of damages in deceit, "the difference in actual value between that which the plaintiff[s] in fact got and that which they would have received if the representations had been true." He in effect adopted the auditor's findings on damages. Upon the auditor's findings, including the finding that Baldwin-Rice "went out of business . . . because . . . [the] steamless heaters did not possess the . . . attributes repre-

[3] See *Alpine* v. *Friend Bros. Inc.* 244 Mass. 164, 167; *Moran* v. *Levin,* 318 Mass. 770, 773; *Dubois* v. *Atlantic Corp.* 322 Mass. 512, 520; *Golding* v. *108 Longwood Ave. Inc.* 325 Mass. 465, 467; *Snell* v. *Cohen,* 326 Mass. 40, 42; *Kilroy* v. *Barron,* 326 Mass. 464, 465; *Verville* v. *Mason,* 334 Mass. 322, 324; Restatement: Torts, § 540. See also *Sandler* v. *Elliott,* 335 Mass. 576, 580–583.

sented . . . by Acme and Price," the trial judge was warranted in concluding that the whole business disaster and all the losses were caused by the failure of the heaters to come up to the standards stated in the representations.

The Massachusetts decisions, in awarding damages in actions of deceit, have followed, at least in appropriate cases, the "benefit of the bargain" rule.[4] Under this rule the plaintiff is entitled to recover the difference between the value of what he has received and the actual value of what he would have received if the representations had been true. See *Morse* v. *Hutchins,* 102 Mass. 439, 440; *Kerr* v. *Shurtleff,* 218 Mass. 167, 172–173; *Piper* v. *Childs,* 290 Mass. 560, 562; *National Shawmut Bank* v. *Johnson,* 317 Mass. 485, 491; *Ceder* v. *McCarthy,* 320 Mass. 618, 619–620; *Spillane* v. *Corey,* 323 Mass. 673, 675–676. See also *Bellefeuille* v. *Medeiros,* 335 Mass. 262, 265–266. This rule affords a recovery in deceit closely resembling that for breach of warranty. See Williston, Contracts (Rev. ed.) §§ 1391–1394.

The misrepresentations might reasonably have caused the plaintiffs to believe that the heaters were unique. The trial judge thus could have concluded that the defendants should have foreseen (a) that, relying on the misrepresentations, the individual plaintiffs would leave their former employments, make loans to and investments in a business or corporation to be formed, and lose those investments, and (b) that, without such a unique heater having the represented characteristics, Baldwin-Rice would incur substantial losses, in competition with equally good established heaters.

Doubtless, as was said in *Thomson* v. *Pentecost,* 206 Mass.

---

[4] Cf. the so called "out of pocket" rule embodied in Restatement: Torts, §§ 525, 549. See Harper and James, Torts, § 7.15, esp. nn. 7, 53; Proc. Am. Law Inst. Vol. XIII, pp. 373–388. Section 549 permits recovery of "the pecuniary loss which results from the falsity of the matter misrepresented, including (a) the difference between the value of the thing bought . . . and . . . the value of the thing exchanged for it, and (b) pecuniary loss suffered otherwise as a consequence of . . . reliance upon the truth of the representation." See *Spillane* v. *Corey,* 323 Mass. 673, 675–676, in which it was pointed out that § 549 (a) "is not the law of this Commonwealth," which does not thus limit recovery.

505, 512–513, *S. C.* 210 Mass. 223, 227, the individual plaintiffs would have been "content, if the defendant[s'] representations were true, to run the risk of undertaking this . . . [distributorship] and abandoning their former occupations . . . . They are indemnified if these representations are made good" and if they recover under the benefit of the bargain rule "the difference between the actual value of this new employment . . . and what that value would have been if the defendant[s'] representations had been true."

The plaintiffs' just complaint is that, because of the misrepresentations, the hazards of the distributorship were vastly greater than the plaintiffs had reason to believe them to be. In the circumstances, the damages awarded conceivably could be fitted into the concepts of the benefit of the bargain rule, on the theory that the distributorship and heaters received by the plaintiffs were worth less than represented by at least the amount of the losses caused by the misrepresentation. The trial judge, however, despite his statement of the benefit of the bargain rule of damages, has based the damages awarded very directly on the losses in fact suffered. There were no express findings about (a) what the value of the distributorship would have been if the representations had been true and (b) its value in the light of the falsity of the representations, which might be a negative value in view of the losses and liabilities likely to be incurred because the representations were false. Obviously in proving these values the plaintiffs would meet serious difficulties, which would be only partly overcome by recognition (see *Piper* v. *Childs*, 290 Mass. 560, 563) that the "amount of damages seldom can be proved with . . . [mathematical] exactness" and that much "must be left to estimate and judgment, sometimes upon meager evidence." Such difficulties of proof, however, can hardly be permitted (under a rule of damages designed to be generous in comparison with the out of pocket rule, see footnote 4, *supra*) to relieve defendants of responsibility for losses which their misrepresentations have caused. See *Thomson* v. *Pentecost*, 210 Mass. 223, 224, 226. Accordingly, we

consider whether the Massachusetts rule of damages permits the award of damages in the amount of the losses in fact caused by the misrepresentations, where only such damages are sought and proved.

The benefit of the bargain rule has not been rigidly followed in this Commonwealth, and this court has suggested that the rule may be modified or supplemented to prevent injustice. See *Kilgore* v. *Bruce,* 166 Mass. 136, 139 ("The rule of damages is to be such as will be just, under the circumstances of the particular case"); *Whiting* v. *Price,* 172 Mass. 240, 242–243 (subsequent events taken into account in measuring difference in values received and as represented); *Thomson* v. *Pentecost,* 210 Mass. 223, 227 ("[S]uch damages are recoverable as will make the plaintiff whole under the circumstances . . . in the particular case"); *David* v. *Belmont,* 291 Mass. 450, 453 ("[T]he damages recoverable are those which naturally flow from the fraud"); *Schleifer* v. *Worcester No. Sav. Inst.* 306 Mass. 226, 227–228 (expenditures made on basis of representations alleged as damage). See also *McCarthy* v. *Brockton Natl. Bank,* 314 Mass. 318, 327–328; *Pearl* v. *Wm. Filene's Sons Co.* 317 Mass. 529, 532–533 (indication that husband could recover expenses incurred in treatment of wife's hair for injury caused by misrepresentation in sale of a "permanent wave set"); *Dubois* v. *Atlantic Corp.* 322 Mass. 512, 522; *Kilroy* v. *Barron,* 326 Mass. 464, 466 (allegation of "considerable expense because of the defendant's fraud" sufficient).

As one text writer points out, "[f]ew courts have followed either rule with entire consistency" and there have been "proposals . . . to introduce some flexibility into the measure of damages." Prosser, Torts (2d ed.) § 91, pp. 569–570. See Harper and James, Torts, § 7.15; McCormick, Damages, § 121 (esp. at pp. 452, 454); Hannigan, Measure of Damages in Tort for Deceit, 18 B. U. L. Rev. 681; Notes, 26 Corn. L. Q. 133–137; 55 Harv. L. Rev. 1019–1025; 61 Harv. L. Rev. 113, 173–175; 23 Minn. L. Rev. 836; 19 Ore. L. Rev. 64; 13 So. Cal. L. Rev. 168; Annotations, 124 A. L. R. 37, esp. at 67; 24 A. L. R. 2d 742; 54 A. L. R. 2d 660,

698–706. Some of these authorities refer to principles which tend to reconcile the out of pocket rule and the benefit of the bargain rule. See *Selman* v. *Shirley,* 161 Ore. 582; 124 A. L. R. 1, 14. See also *United States* v. *Ben Grunstein & Sons Co.* 137 F. Supp. 197, 207–210 (D. N. J.); *Weitzel* v. *Jukich,* 73 Idaho, 301, 307–309; *Zeliff* v. *Sabatino,* 15 N. J. 70, 74–76.[5]

A possible reconciliation of the two rules (based on the *Selman* case, *supra*) is summarized in Prosser, Torts (2d ed.) 570: "1. If the defrauded party is content with the recovery of only the amount he has actually lost, his damages will always be measured under that rule. 2. If the fraudulent transaction also amounted to a warranty, he may recover for loss of the bargain, because a fraud accompanied by a broken promise should cost the wrongdoer as much as the breach of promise alone. 3. Where . . . the proof . . . [is] so vague as to cast virtually no light upon the value of the property had it conformed to the representations, damages will be awarded equal to the loss sustained, and 4. Where the damages under the benefit-of-bargain rule are proved with reasonable certainty, that rule will be employed. In addition . . . the plaintiff may recover for consequential damages, such as . . . expenses to which he has been put, provided that they are regarded as 'proximate' results of the misrepresentation."

Rules 1 and 3 tend to prevent the benefit of the bargain rule from operating to defeat a just recovery where misrepresentation has caused real damage but where values cannot easily be proved. All the elements of damage and loss allowed by the trial judge could have been found to have been caused proximately by the misrepresentations within these rules. So far as applicable here, they seem to be consistent with, and to substantiate, the statements in those

---

[5] Other pertinent cases are *Kilby Locomotive & Mach. Works* v. *Lacey & Son,* 12 Ala. App. 464, 467–470, *Marion* v. *Miller,* 237 Minn. 306, 309–311, and *Zingale* v. *Mills Novelty Co.* 244 Wis. 144, 151–152. See *Horner* v. *Wagy,* 173 Ore. 441, 447–449, and *Sorensen* v. *Gardner,* 215 Ore. 255, 264–266, where the Oregon court may have limited somewhat its application of the rule in *Selman* v *Shirley.* See also *Bridgmon* v. *Walker,* 218 Ore. 130, 134–135.

Massachusetts cases, already cited, which supplement the benefit of the bargain rule. Although it has been suggested that rigid application of the benefit of the bargain rule may remove "speculation attendant in attempting to ascertain what portion of [such a] loss is attributable to the fraud and what portion . . . to bad management or other factors not connected with the fraud," see *Salter* v. *Heiser*, 39 Wash. 2d 826, 834, the trial judge's findings here establish that the losses of Baldwin-Rice were "direct results of the wrong." In adopting the auditor's findings, the judge impliedly made similar findings as to Baldwin's and Rice's losses. There was no error in the assessment of damages.

2. The basis of Acme's liability is sufficiently established by the judge's finding that Price "exercised control over the business affairs of . . . Acme . . . and . . . Lincoln Park." The judge could reasonably have inferred that Price was duly authorized to act and was acting for Acme which manufactured the heaters.

Baldwin-Rice and Lincoln Park were each organized to make, and to carry out the purposes of, the agreement induced by the negotiations. Price's representations could have been found to have been made for Lincoln Park's benefit and to have been adopted by it after its formation. The effect of these representations continued after the organization of Lincoln Park and Baldwin-Rice. See *Joseph* v. *Tata*, 339 Mass. 600, 602; Restatement: Torts, § 535. Indeed, the auditor found that, even after April 4, 1955, when the two corporations were formed, Price repeated some representations on a radio broadcast and that Acme and Price approved Baldwin-Rice advertising containing the misrepresentations. It could have been found also (1) that Price and Acme should have foreseen that the misrepresentations would affect the activities of Baldwin-Rice, and (2) that they were intended to do so. See *Iowa Economic Heater Co.* v. *American Economic Heater Co.* 32 Fed. 735, 737 (C. C. N. D. Ill.). There was no error in the award of damages in favor of Baldwin-Rice or against Lincoln Park.

No assignment of a fraud claim is here involved. Cf.

*American Woolen Co.* v. *Old Colony Trust Co.* 263 Mass. 321, 324–325. This is a case where the circumstance that the newly formed corporate entities were separate from their respective shareholders is made irrelevant (cf. *Cheng* v. *Chin Wai Yip*, 339 Mass. 173, 176–177) by the complete control of the new corporations, respectively, by the persons to whom and by whom the representations were made and by the fact that the corporations were formed and planned to carry out the parties' arrangements. By their contract made by agents with full knowledge of the representations (see Restatement 2d: Agency, §§ 84, 104, 326; Fletcher, Cyc. Corporations, §§ 218, n. 54, 4897), Baldwin-Rice in effect accepted the benefit and Lincoln Park assumed the burden of the prior representations designed to bring about this very contract. See discussion in *Reed* v. *A. E. Little Co.* 256 Mass. 442, 448; *Quincy Trust Co.* v. *Woodbury*, 299 Mass. 565, 568; *Boston Five Cents Sav. Bank* v. *Brooks*, 309 Mass. 52, 58; *Buckman* v. *Elm Hill Realty Co. of Peabody*, 312 Mass. 10, 15–16. Cf. *Koppel* v. *Massachusetts Brick Co.* 192 Mass. 223, 225; *Mansfield* v. *Lang*, 293 Mass. 386, 399.

*Exceptions overruled.*