Dennis W. TURNBULL & Rodger Bigby, d/b/a Denro Investments, Appellant, Cross-Appellee

v.

Colette LaROSE, Turnagain-By-The-Sea, Inc., d/b/a Marston Real Estate, Mueller Building Investors, a Hawaii Limited partnership, and Robert D. Mueller, individually and as General Partner, and John Does I, II, III, et al., General Partners, Appellees, Cross-Appellant.

Nos. S–313, S–327.

Supreme Court of Alaska.

July 19, 1985.

James D. Gilmore, Gilmore & Feldman, Anchorage, for appellant.

Richard R. Hoffman, Ronald L. Baird, Kemppel, Huffman & Ginder, Anchorage, for appellees, LaRose and Turnagain-By-The-Sea.

Thatcher R. Beebe, Francis J. Nosek, Jr., Anchorage, for appellees, Mueller Building Investors and Robert C. Mueller.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, and COMPTON, JJ.

## OPINION

RABINOWITZ, Chief Justice.

Appellants Dennis Turnbull and Rodger Bigby, d/b/a Denro Investments (Denro), are purchasers of the Mueller Building, a structure in downtown Anchorage. Appellees include Mueller Building Investors and Robert D. Mueller, the previous owner of the building, and Collette LaRose and Turnagain-by-the-Sea, Inc., d/b/a Marston Real Estate, the real estate agent and agency that negotiated the sale of the building. Appellants contend there were material misrepresentations in connection with the sale of the building. The superior court granted appellees' motion for summary judgment and this appeal followed. We conclude, viewing the record in the light most favorable to the appellants, that genuine material questions of fact remain to be tried.

Turnbull, a Seattle businessman, first met with the broker LaRose in November

1977 to discuss possible real estate investments in the Anchorage area. Turnbull testified that he informed LaRose early in the negotiations that he wanted to obtain a property that would produce steady rental income from which the mortgage payments could be made. LaRose suggested consideration of the Mueller Building, which was at that time under lease to the State of Alaska. The state, which had been renting the building since May 1974, had one one-year option remaining on its lease; the lease would be extended through April 1979, if the state notified the owner of its desire to do so by March 1, 1978. Turnbull says that LaRose told him that if the state took the final lease option, the state "would more than likely stay in the building for many years to come." In other words, the state would probably want to negotiate a new long term lease with the new owners. A number of assurances to this effect were allegedly made.

Denro agreed to buy the building on the condition that the state exercised the one-year option. An earnest money agreement to that effect was signed in the middle part of February, 1978.[1] The agreement states that it is a "legally binding contract" and that the buyer agrees "to purchase and pay for the above described property on the terms and conditions herein stated." The purchase price was $475,000 and the agreement provided for a forfeitable earnest money deposit of $2,500.

The state did take the one-year option on its lease. However, the state did so on the condition that it could assign the lease to another party in the middle of the one-year lease period. The lease provided that the lessor must consent to an assignment but that such consent "shall not be unreasonably withheld." Mueller apparently agreed to the assignment on or about February 22,

1978. On that date the state sent Mueller a telegram which read:

THIS IS TO CONFIRM CONSERVATION [SIC] OF 2–22–78 ACCEPTING THE RENEWAL OFFER AT THE SAME RATE AS IS WITH RIGHT FOR ASSIGNMENT OF LEASE ON OR ABOUT OCTOBER 15 1978 AMENDMENT WILL FOLLOW IN THE MAIL.

On April 5, 1978, LaRose sent Turnbull a copy of the wire from the state and informed him that "[t]he assignment of lease refers to a possible change in the Department under which the WIN program is operating." The WIN program is the name of the state organization that occupied the building.

The purchase transaction between Mueller and Denro was closed over a period of several weeks in April and May 1978.[2] On April 21, 1978, Mueller signed an amendment to the lease with the state which (1) extended the lease through April 1979 and (2) granted the right to assign the lease agreement to Charles Blomfield and Associates, a private entity, on or about October 15, 1978.

Denro asserts that it did not know of the true nature of the assignment until August 1978. Denro claims that after an unsuccessful attempt to find a new tenant, it was forced to sell the vacant building in the summer of 1979 for $542,500.

Denro's primary contention is that appellees knew before the purchase agreement was consummated that the state intended to assign the lease to Blomfield and thus that the state had no long term desires with respect to the Mueller Building. Denro claims that it would not have agreed to buy the property had it known that the state had definitely decided to vacate the building. Denro seeks approximately $60,000 in special damages.

---

1. The agreement, dated February 5, was signed by Turnbull on that date. The agreement was then sent to Mueller in Hawaii, who made some changes to the agreement regarding the financing before signing it and returning it to LaRose. On February 10, LaRose sent the revised agreement back to the buyers in Seattle, who initialed the agreement shortly thereafter.

2. The warranty deed was signed by Mueller on April 11, the lease was assigned on April 17, and the recordation date was May 7.

The superior court granted appellees' motion for summary judgment after concluding that the evidence, viewed in the light most favorable to appellants, indicated that appellants did not reasonably rely upon any alleged misrepresentations made by appellees. The superior court also concluded that appellants had not presented evidence upon which a jury could reasonably base a finding of damages.

## I.

We believe that this case is best analyzed as one involving a failure to disclose information when there is an affirmative duty to do so. The Restatement (Second) of Torts § 551 (1977) expresses the rule as follows:

> (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
>
> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
>
> . . . .
>
> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so.

*See also* Prosser, Law of Torts § 106, at 696 (4th ed. 1971).[3] Thus, even if appellees were not aware of the state's true inten-

tions at the time Turnbull was allegedly told that the state would likely remain a tenant for many years if the state took the last option, appellees may have had a duty to disclose when they subsequently became aware of the assignment.

■ Appellees argue that one could not, as a matter of law, justifiably rely on the alleged remarks of LaRose because they were mere opinions, as distinguished from statements of fact. Since there could not be any reasonable reliance on the assurances, goes the argument, there is no duty triggered to disclose any subsequently acquired information. They point out that Turnbull admits that he knew that the state was not bound to stay after the one-year option expired and thus that there was some risk that the building would soon be vacant. We find this reasoning unpersuasive. Salespersons cannot immunize themselves from liability when conducting risky transactions simply by phrasing their representations as to the extent of the risk in the form of opinions or predictions. While we have noted that some sales talk or "puffing" should be discounted by the reasonable buyer,[4] we decline to adopt a rule which "amounts to a seller's privilege to lie his head off." Prosser, Law of Torts, § 109 at 723 (4th ed. 1971).[5]

■ Appellees also argue that there could not have been any reliance because there is no evidence indicating that they were aware of the assignment to Blomfield before the purchase agreement was consummated. They point to *Schepps v. Howe*, 665 P.2d 504 (Wyo.1983), where the Wyoming Supreme Court upheld the lower court's entry of summary judgment in fa-

---

**3.** *See also Bevins v. Ballard*, 655 P.2d 757, 760 (Alaska 1982). The duty to disclose in such a situation has also been held to arise out of the U.C.C. § 1–203 requirement, AS 45.01.203, that parties to a transaction deal in good faith. *See, e.g., Liebereselll v. Evans*, 93 Wash.2d 881, 613 P.2d 1170 (1980).

**4.** *See Cousineau v. Walker*, 613 P.2d 608, 611 n. 4 (Alaska 1980).

**5.** We also reject LaRose's similar argument that, because the buyers undertook their own investigation through an attorney, they could not have, as a matter of law, relied upon any of her statements. Such a rule would only tend to deter people from conducting necessary investigations. *See Pioneer Nat'l Title Ins. Co. v. Lucas*, 155 N.J.Super. 332, 382 A.2d 933 (App.Div.1978).

vor of a house seller because the misrepresentations about the condition of the house had been made after both parties signed a binding purchase agreement. We agree, of course, that one cannot be induced to enter an agreement as a result of a later misrepresentation. However, we think in this case there is sufficient evidence to create a genuine issue of material fact as to whether appellees were aware of the assignment before the signing of the earnest money agreement in February, 1978.

■ Courts must be cautious in granting a motion for summary judgment when resolution of the dispositive issues requires, as in this case, determination of state of mind. In such circumstances, the fact finder should be given the opportunity to observe the demeanor of the witnesses whose states of mind are at issue. *Croley v. Matson Navigation Co.,* 434 F.2d 73, 77 (5th Cir.1970). On the other hand, "the fact that a party desires to have an affiant's statements tested by a jury, in and of itself, will not preclude a grant of the motion [of summary judgment] unless the evidence presented casts sufficient doubt on the affiant's credibility to create a genuine issue of material fact." 10A Wright & Miller, Federal Practice and Procedure § 2730, at 237–238 (2d Ed.1983) (footnote omitted).

There is evidence in the record tending to support the view that appellees knew, before the purchase agreement was signed, that the state would be leaving the building. For instance, the April 5 letter from LaRose telling Turnbull that the assignment refers only to a possible change in the department within the state that would be

running the WIN program. In her deposition, LaRose said that her only basis for making that statement was her "general past experience with leases." She apparently made no effort to verify her assertion. Appellees contend that the April 5 letter is of no relevance, since by then Denro had already agreed to buy the building. While we agree that the April 5 letter could not have induced Denro to enter into the purchase agreement, we think that it calls into question LaRose's credibility, and therefore a jury should be given the opportunity to determine her pre-agreement state of mind with respect to the assignment.

■ We also note that the record contains a letter sent to Turnbull by a state employee in November, 1978, which states that the assignment had been discussed and agreed upon by Mueller prior to the sale of the property. This letter was not made under oath, but it was not objected to on those grounds and no party contests its authenticity. Thus, it can be considered on a summary judgment motion. *See Kvasnikoff v. Weaver Bros., Inc.,* 405 P.2d 781 (Alaska 1965).

■ While we intend to express no opinion on the merits of this case, the evidence and reasonable inferences therefrom, looked at in the light most favorable to appellants, leads us to conclude that there were genuine issues of material fact regarding whether appellees breached their duty to disclose information.[6] The superior court thus erred in granting summary judgment on that theory.[7]

## II.

■ Damages in this type of action are usually measured in accordance with

---

6. We find it curious that the record contains no affidavits from state employees who negotiated for the assignment right, but, given the procedural status of this appeal, we draw no negative inference from this fact. These individuals were presumably available to testify for either party.

7. We also conclude that, even if the appellees did not find out about the assignment to Blomfield until after the earnest money agreement became binding, they may have had a duty to

disclose such information to Denro. Prosser writes that "one who has made a statement, and subsequently acquires new information which makes it untrue or misleading, must disclose such information to anyone whom he knows to be still acting on the basis of the original statement." Prosser, Law of Torts § 106, at 696 (4th ed. 1971). Evidence indicates that Denro did not find out about the assignment until August, 1978, and even then from someone other than LaRose or Mueller. If earlier notice had been

the benefit of the bargain rule. D. Dobbs, Remedies § 9.2 at 595 (1973). This is similar to the measure of damages generally used in contract cases, where the purpose is to give the injured party his expectation interest for loss of bargain. Under this rule, a plaintiff is entitled to recover the difference between the actual value of the purchase and the value the purchase would have had had the representations been in fact true. An alternative measure of general damages, known as the out of pocket or restitution measure, entitles the plaintiff to recover the difference between the value of what he has parted with and the value of what he has received in the transaction. This rule puts the plaintiff back in the same financial position he was in before the transaction occurred. A plaintiff should have the opportunity to use either measure, providing the measure selected accomplishes substantial justice in the particular circumstances and the plaintiff can present facts necessary to establish his claim. *Rice v. Price,* 340 Mass. 502, 164 N.E.2d 891 (1960); *Zeliff v. Sabatino,* 15 N.J. 70, 104 A.2d 54 (1954); *Selman v. Shirley,* 161 Or. 582, 85 P.2d 384 (1938). *See also* D. Dobbs, Remedies § 9.2, at 597 (1973).

■ In addition to general damages under one of the above measures, a plaintiff in this type of action is permitted to recover such special or consequential damages as he can prove with reasonable certainty. The plaintiff, however, may not recover by way of special damages for any item already covered by the recovery of general damages. Dobbs, *supra* at 599–600. Further, the plaintiff cannot recover special damages considered too remote or removed from the misrepresentation, a limitation usually expressed in terms of proximate cause. *Baker v. Northwestern National Casualty Co.,* 26 Wis.2d 306, 132 N.W.2d 493 (1965).

Denro claims to have suffered damages in the amount of $62,736.76. These alleged damages all arise from the state's vacating the building and the resale of the property, and include the real estate commission on the resale, closing costs, attorney's fees, lost rental income, air fare, and other expenses.

The superior court ruled that these expenses could not, as a matter of law, be recovered:

> [T]he plaintiffs here have not shown that all, or any, of their resale expenses were directly caused by the defendants' alleged misrepresentation. The claim of causation here is too attenuated to support a jury finding of consequential damages. Plaintiffs therefore fail to present a claim for which relief could be granted.

The superior court also concluded that, under either of the general measures of damages, appellants had not offered enough evidence to support an assessment of damages. The benefit of the bargain rule could not support an award, the court reasoned, because no evidence was submitted of the building's actual value at the time of purchase. The out of pocket measure could not support an award since appellants who sold the building for a profit, had not shown any net loss resulting from the transaction.

■ Denro does not contest the superior court's conclusion that the record cannot support an award of general damages. It argues, however, that the question of whether some or all of the special damages claimed were proximately caused by the alleged failure to disclose is one for the jury. We agree.

■ Questions of proximate cause are normally for the jury, and the court may seldom rule on them as a matter of law.

---

forthcoming, Denro might have reduced its losses. Thus, even if Denro cannot prove that appellees knew before the earnest money agreement was signed that the state would vacate the building, it can still recover those damages, if any, proven with reasonable certainty that resulted from the subsequent absence of disclosure if it can show that appellees knew that it was still relying on the earlier assurances.

*Sharp v. Fairbanks North Star Borough,* 569 P.2d 178 (Alaska 1977). Given the record before us, we cannot say that the connection between the special damages claimed and the alleged misrepresentations is too uncertain or remote as a matter of law. Certainly with respect to some of the claimed items of damages, such as certain travel expenses and attorney fees, there is sufficient evidence to support the view that they were the natural or proximate result of the alleged failure to disclose.[8] Since we conclude that some of the claimed items of special damages should go before the jury, we need not now pass on the sufficiency of the evidence with respect to every claimed injury.[9]

For the foregoing reasons, the superior court's grant of summary judgment in fa-vor of appellees is REVERSED, and the case is REMANDED for proceedings not inconsistent with this opinion.[10]

MOORE, J., not participating.

---

**8.** *See McInnis & Co., Inc. v. Western Tractor & Equipment Co.,* 67 Wash.2d 965, 410 P.2d 908 (1966) (court allowed a recovery of travel expenses necessitated because of fraud).

**9.** If the court, after hearing all the evidence, is still of the view that some of the claimed damages are not supported by the evidence, it may grant a partial directed verdict or modify the judgment notwithstanding the verdict in accordance with Alaska Civil Rule 50.

**10.** Our disposition makes it unnecessary to consider the issues raised in the cross-appeal.