856 P.2d 766 (1993)
STATE of Alaska, DEPARTMENT OF NATURAL RESOURCES, Appellant/Cross-Appellee,
v.
TRANSAMERICA PREMIER INSURANCE COMPANY; Haralambos Blanas, a/k/a Harry Blanas; the Delta Greely Arts Council; and State of Alaska, Department of Administration, Appellees/Cross-Appellants.
Haralambos BLANAS a/k/a Harry Blanas, Appellant,
v.
STATE of Alaska, DEPARTMENT OF NATURAL RESOURCES; State of Alaska, Department of Administration; Delta-Greely Arts Council; Transamerica Premier Insurance Company, Appellees.
Nos. S-4915, S-4940 and S-4992.
Supreme Court of Alaska.
July 23, 1993.
Rehearing Denied August 26, 1993.
*769 Virginia A. Rusch, Asst. Atty. Gen., Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellant/cross-appellee [State of Alaska, Dept. of Natural Resources.]
David R. Trachtenberg and Traeger Machetanz, Oles, Morrison & Rinker, Seattle, WA, for appellee/cross-appellant Transamerica Premier Ins. Co.
Haralambos Blanas, in pro per.
Before MOORE, C.J., and RABINOWITZ, BURKE, MATTHEWS and COMPTON, JJ.

*767 OPINION

MOORE, Chief Justice.

I. INTRODUCTION
This appeal consolidates three actions arising from the construction of an arts education facility at Big Delta State Historical Park, near Delta Junction. Transamerica Premier Insurance Co. (Transamerica), the surety for contractor Haralambos Blanas, claims that erroneous plans and specifications caused Blanas to incur so many extra costs completing the project that his business collapsed. In original actions before the superior court, Transamerica sought tort damages from the state for business destruction, and Blanas sought damages for related personal losses. The superior court awarded the state summary judgment in both actions, *770 but held that Transamerica could pursue a contract claim for consequential damages in the administrative forum. We affirm.

II. FACTS
Planning for this project began when the Delta-Greely Arts Council proposed building a performing arts center in Big Delta State Historical Park, on the site of an old Alaska Road Commission garage. The council obtained state grant proceeds for the initial design work, and contracted with architect Samuel D. Combs to prepare the building plans and specifications.
Because the project would be located at a state historic site and on state land, the Division of Parks insisted that any new structure appear as the original Road Commission garage did. In order to ensure that the facility's location, dimensions, and building materials were historically accurate, the Division reviewed the project plans and directed Combs to make numerous changes. Complaining that he lacked the time to incorporate a number of last-minute changes into the final plans themselves, Combs instead attached these changes to the plans as addenda. Combs also refused to incorporate subsequent changes, arguing that the state should pay him the cost of making them.
In 1985 the Division of Parks made an agreement with the Delta-Greely Arts Council, under which the Division would put the project out for bid, "[a]dminister and manage the construction of the Project," and "[p]erform project inspections." The Division of Parks told the council that budgeted management expenses included costs for "continuous on-site monitoring by our engineering assistant."
Meanwhile, because insufficient funds were available for completing the whole project, the Division broke it down into four construction phases, which would complete the facility's exterior shell and basic mechanical systems but leave its interior essentially unfinished. Daryl Haggstrom, the project manager and a civil engineer, and Robert Mitchell, the project engineer, reviewed Combs's plans and specifications in order to determine what jobs could be done at each phase, and attached addenda to clarify any errors or inconsistencies discovered in the process. During the review process, the Division made no substantive changes in the plans or specifications without first getting the approval of Combs or an outside engineer.
At the time of the review, a deadline for putting the project out to bid was fast approaching, and funding for the facility would lapse if the Division failed to meet the deadline. Therefore, the plan review was a hurried one. Because of the time constraints involved, the Division did not do a full review of the plans for consistency.
In April 1986 the Division of Parks put the project out to bid, allocating $215,000 for performance of as many phases of the contract as possible. Blanas offered the lowest bid, $211,700 for all four phases, and signed a contract with the Division of Parks.
During the course of construction, a number of problems arose as a result of errors and discrepancies in the plans and specifications, and the Division had to issue extra work orders and change orders to correct these mistakes. At first, the Division of Parks kept an inspector on the work site, but in order to offset budget overruns incurred while preparing the plans for bid, the Division later removed him. The Division of Parks handled most of the subsequent problems over the telephone, and communication problems between the Division and Blanas arose.
In September Blanas informed the Division of his intent to file a claim for the extra costs incurred as a result of plan defects. In November the Division sent Blanas its calculations of the compensation it owed for the remaining extra work orders and change orders associated with the project. Blanas rejected all of these calculations, as well as the calculations for three change orders issued earlier.

III. SUMMARY OF PROCEEDINGS BELOW
In February 1987, pursuant to AS 44.77.010(a),[1] *771 Blanas submitted a claim to the state for $156,588.69 in extra costs. On May 8, 1987, the Department of Natural Resources issued its claims decision, awarding Blanas $16,516.97 for extra costs.
In late June Blanas appealed this decision to the Department of Administration, pursuant to AS 44.77.020(a).[2] In addition to his claim for extra costs, Blanas sought up to $242,000 in consequential damages, arguing that the debts that he incurred on the project destroyed his business. The Department of Administration held a hearing on Blanas's claims in July. Blanas originally refused to present evidence as to the damages for business destruction, arguing that the state's tortious conduct, rather than a breach of contract, caused the harm. However, at the end of the proceedings Blanas requested the chance to present this evidence, and the hearing officer set a second hearing for October.
A week before the second hearing, Blanas moved for a stay of the proceeding, because he wished to assert his business destruction claims in the superior court and "seek a determination ... regarding the necessity of any further proceedings on such claims at the administrative level." Blanas added that he was not moving "for any stay or other delay in the determination of those claims which have been presented and argued to the Hearing Officer." The state agreed to the stay, and the hearing officer granted it on October 25.
A few days later, Blanas assigned all of the claims of his contracting firm to Transamerica, his surety, and on that same day, Transamerica filed an original action in superior court, seeking tort damages for the destruction of Blanas's business. Also included in the complaint was a request for a declaratory judgment as to whether the business destruction claims must be brought through an administrative proceeding. The state moved for summary judgment on these claims.
In January the Department of Administration decided the remaining extra cost claims. The hearing officer increased Blanas's extra cost award to $30,208.95. In addition, he expressly stated that he had postponed any evidentiary hearing, discovery, or findings on the consequential damages claim "pending receipt of instructions from the Superior Court."
On March 1, 1990, Blanas filed a complaint against the state, seeking damages for the losses that he and his wife personally incurred because of the collapse of his business. In particular, he sought damages for loss of business, loss of personal assets, and emotional distress. The state moved to dismiss the complaint under Alaska Civil Rule 12(b)(6),[3] arguing, among other things, that the Blanases had filed the complaint after the statute of limitations had run.
In July 1991 Judge Dana Fabe decided the state's motions. Judge Fabe granted the state summary judgment on Transamerica's tort claims, but permitted Transamerica to return to the administrative hearing for a determination of any contract claim for consequential damages. Judge Fabe also dismissed Blanas's complaint for personal damages, ruling, among other things, that Blanas's allegations were in tort, that the two-year statute of limitations for torts therefore applied, see AS 09.10.070, and that Blanas had filed his complaint after the limitations period had run.
Transamerica and the state moved for reconsideration and clarification. In particular, *772 the state asked Judge Fabe to reconsider her return of Transamerica's damage claims to the administrative forum, and to bar litigation of those claims in the administrative hearing. Judge Fabe denied the state's request.
Blanas also moved for reconsideration, arguing, inter alia, that his claims were in contract, not tort. For the first time, he also invoked an equitable estoppel argument, alleging that the Division of Parks induced him into not filing a suit within the limitations period. Judge Fabe denied Blanas's motion.
All three parties appeal. The state appeals Judge Fabe's remand of the consequential damage claims to the administrative hearing. Transamerica cross-appeals Judge Fabe's grant of summary judgment to the state on the tort claims. Blanas appeals the dismissal of his personal damage claims. These appeals have been consolidated for review.

IV. DISCUSSION

A. The Nature of the Duty Owed to Blanas

Transamerica contends that its tort claims for business destruction are proper, on the grounds that "the state owed Blanas a duty of care to ensure that neither the preparation of the plans and specifications nor the administration of the project contract were negligently performed," and that the state breached this duty.[4] Transamerica argues that though the state was the owner of the building site, the review of Combs's designs by the Division of Parks made the state a design professional as well.
A design professional has a duty in tort "to exercise reasonable care, or the ordinary skill of the profession, for the protection of anyone lawfully upon the premises whose injury is reasonably foreseeable as the result of negligent design, plans, orders, or directions." Moloso v. State, 644 P.2d 205, 217 (Alaska 1982). Thus a design professional owes a duty of care not to injure an independent contractor's employees through the negligent provision of services. See id. Furthermore, a project owner may sue a design professional in tort for economic losses arising from the professional's malpractice, despite the existence of a contractual relationship between the parties. See Clark v. City of Seward, 659 P.2d 1227, 1231 n. 3 (Alaska 1983). A tort action is available in such cases because the duty of professional care is one that the law imposes, not the contract. Id.
Unlike design professionals, project owners owe purely contractual duties as to the accuracy of designs. When providing plans and specifications to a contractor, an owner makes an implied warranty that they will be sufficient for their particular purpose. Fairbanks N. Star Borough v. Kandik Constr., Inc. & Assocs., 795 P.2d 793, 797 (Alaska 1990), vacated in part on other grounds, 823 P.2d 632 (Alaska 1991). If defective specifications cause the contractor to incur extra costs in performing the contract, then the contractor may recover those costs that result from breach of the implied warranty. Id. The implied warranty is part of the bargain between the owner and the independent contractor, and does not exist outside the contract. Because this duty arises solely from a contractual promise, a party cannot use a tort action to enforce it. See Alaska Pac. Assurance Co. v. Collins, 794 P.2d 936, 946 (Alaska 1990).
Transamerica relies on two doctrines to argue that the Division was more *773 than a project owner. First, Transamerica cites Moloso's application of the retained control theory of liability. If an employer hires an independent contractor, but "retains the right to direct the manner of the independent contractor's performance, or assumes affirmative duties with respect to safety," then the employer is liable for its negligent exercise of control, whenever such tortious acts cause physical harm to the independent contractor's employees. 644 P.2d at 211. Second, Transamerica relies on the tort theory of a voluntary undertaking or an assumption of duty. A party that assumes a duty through its own affirmative conduct must discharge that duty with due care. Id. at 212; Adams v. State, 555 P.2d 235, 240 (Alaska 1976). Transamerica argues that the Division incurred tort liability under either doctrine by affirmatively undertaking a review of the plans and initially assigning an on-site inspector to the project.
Transamerica is mistaken. As Judge Fabe properly concluded, Moloso is inapplicable, because in that case the plans and specifications that the employer used were its own, and thus the employer was in fact both the owner and the architect of the project. 644 P.2d at 216. Here, the Division of Parks did not devise its own plans and specifications, but rather used those of an independent architect, Samuel Combs. The Division did not assume a design professional's duties simply because it reviewed the plans before putting them out for bid or because it assigned an inspector to the construction site.[5] Through such acts an owner insures that the plans are suitable both for its own purposes and for the purposes of the contractor, and that the plans thus satisfy the warranty of sufficiency implied in the owner-contractor bargain.
The contract between the Division of Parks and Blanas, like most construction contracts, allowed for unanticipated deviations from the plans and specifications. The contract terms allowed the Division to issue orders for changes and extra work as needed. The contract also allocated unexpected losses by defining which of the contractor's extra costs the Division would compensate and how the Division would compensate them. In the event of a dispute over costs, the parties could obtain administrative review pursuant to AS 44.77.
To expose an owner to liability as a design professional might negate the ability of contracting parties to allocate and bargain for risk of loss in commercial transactions. Oldenburg v. Hagemann, 159 Ill. App.3d 631, 111 Ill.Dec. 329, 334, 512 N.E.2d 718, 723 (1987), appeal denied, 118 Ill.2d 546, 117 Ill.Dec. 226, 520 N.E.2d 387 (1988). Therefore, even if the owner negligently provides defective plans and specifications, which cause economic loss to the contractor in the course of performance, the contractor's action for the owner's breach is in contract, not tort. See Collins, 794 P.2d at 946 ("We decline to hold that where a party breaches a contractual promise `negligently,' such conduct may form the basis for a tort action."); see also Scott Co. v. MK-Ferguson Co., 832 P.2d 1000 (Colo. App. 1991) (denying subcontractor a tort action for negligence against general contractor who supplied defective plans and specifications); Oldenburg, 111 Ill.Dec. at 332, 333, 512 N.E.2d at 721, 722 (denying subcontractor a tort action against general contractor who, among other things, allegedly did not inspect subcontractor's work).
In this case, Judge Fabe correctly concluded that Samuel Combs, not the Division of Parks, was the project architect, and that the Division assumed no duty to review Combs's plans for accuracy. The record indicates that the sole purpose for the state's review of the plans was to check for historical accuracy and to divide the plan into four phases for construction. Though it clarified any errors it happened *774 to notice during its review, the Division of Parks did not substantively change Combs's plans and specifications without consulting Combs or an outside engineer, and Transamerica does not allege that the Division did otherwise. Therefore, Transamerica's tort claims for professional negligence must fail.

B. The Tort Claim for Bad Faith Breach of Contract

In the alternative, Transamerica contends that the state systematically denied all of Blanas's extra cost claims, regardless of their merit, in a calculated effort to wear Blanas down through expensive litigation. Transamerica looks primarily to a Division of Parks' administrative brief, which notes the high cost to Blanas of pursuing his claims past a Department of Administration hearing. In addition, the state required Blanas to break down his claim item by item for administrative review. Transamerica argues that this "war of attrition" amounts to a tortious breach of the implied warranty of good faith and fair dealing.
As a matter of law, a covenant of good faith and fair dealing is an implied component of any contract. Alaska Pac. Assurance Co. v. Collins, 794 P.2d 936, 947 (Alaska 1990). Breach of this covenant in an at-will employment contract does not constitute a tort. ARCO Alaska, Inc. v. Akers, 753 P.2d 1150, 1153 (Alaska 1989). However, when the contract is an insurance contract, we have allowed an insured to maintain a tort action against an insurer for breach of the covenant. State Farm Fire & Casualty Co. v. Nicholson, 777 P.2d 1152, 1156 (Alaska 1989). Transamerica contends that Nicholson, rather than Akers, governs the relationship between Blanas and the Division of Parks.
We disagree. Nicholson did not "turn[] every breach of a commercial contract into a tort cause of action." 777 P.2d at 1156-57. Instead, Nicholson recognized the special relationship between insurer and insured: the use of standardized contract terms, the insurer's superior bargaining position over the insured, and the fact that the insured seeks protection against calamity, rather than commercial advantage. These exceptional features of the insurance contract justified the creation of a tort action for an insurer's bad faith breach. See id.
In the case of an ordinary commercial contract between sophisticated business entities, a tort for breach arises only when "a party's conduct ... rises to the level of a traditionally recognized tort." Akers, 753 P.2d at 1154. Creating a broader tort remedy would disrupt the certainty of commercial transactions and allow parties to escape contractual allocation of losses. Therefore, an action for breach of the implied covenant of good faith and fair dealing sounds in contract alone.[6]Id.; Great Western Sav. Bank v. George W. Easley Co., 778 P.2d 569, 581 (Alaska 1989).
Here, Blanas entered into an arm's length construction contract for the purpose of commercial gain, and submitted claims for extra costs incurred in performance. The belief of the Division of Parks that a suit in superior court would be costly to Blanas does not prove a premeditated scheme to reject all of Blanas's cost claims in bad faith. Similarly, the fact that Blanas had to break down his claim item by item does not indicate bad faith, because we do not allow use of the "total cost" method in calculating claims. See Kandik Constr., 795 P.2d at 798-99. However, even if Blanas raised a genuine factual issue as to whether the state violated the good faith covenant, his remedy would still be in contract, not tort. On this question, *775 we affirm Judge Fabe's grant of summary judgment to the state.[7]

C. The Remand of the Consequential Damages Claim to the Administrative Hearing

In its appeal of the superior court decision, the state argues that Judge Fabe erred when she ruled that Transamerica could bring its consequential damages claim in the administrative hearing.[8] This contention has no merit whatsoever and borders on being frivolous.
Characterizing Judge Fabe's decision as "a remand to the administrative forum," the state first argues that because the superior court was not engaging in the appellate review of an administrative action,[9] Judge Fabe effectively preempted the power of the hearing officer. This argument is plainly untenable. Judge Fabe did not direct the hearing officer to do anything, but rather held that the administrative forum was the proper one for Transamerica's claims. In any case, as Transamerica correctly notes, the hearing officer's decision on Blanas's extra cost claims expressly put off any determination of the consequential damage claims until the officer received instructions from the superior court.
Second, even though Transamerica's complaint sought a declaratory judgment as to which forum was proper for the consequential damages claims, the state argues that Alaska Civil Rules 57(a), 7(b), and 77 require Transamerica to file a motion for such relief. This argument is baseless. Nothing in the Civil Rules says that Transamerica must file a motion to seek a declaratory judgment. Seeking a declaratory judgment in the pleadings is perfectly proper. See, e.g., American Building & Loan Ass'n, Inc. v. State, 376 P.2d 370, 372 (Alaska 1962). The absence of a motion for a declaratory judgment does not prevent the state from making its own motions and arguments for dismissal or summary judgment on the matter.
The state also contends that Transamerica's failure to act promptly on its declaratory judgment complaint violated the conditions of the hearing officer's stay. This argument is equally baseless. The hearing officer did not condition his grant of the stay on speedy resolution of the issue. If it wished swift resolution of the proceedings, the state could have moved to vacate the stay.
The state's final argument is that because Transamerica argued that its claims before the superior court were in tort, Judge Fabe had no contract claims to "remand." This contention makes no sense. Because parties must raise all contract *776 claims in the administrative hearing process before seeking relief in the superior court, see AS 44.77; State v. ZIA, Inc., 556 P.2d 1257, 1262-63 (Alaska 1976), the only way for Transamerica to succeed in raising an original action would be to recast the business destruction claim as a tort action. As Judge Fabe correctly notes, "Transamerica should not be prejudiced by its decision to first pursue tort theories in Superior Court."

D. Blanas's Claim for Personal Damages

The final issue in this appeal is whether Judge Fabe erred in applying the two-year statute of limitations for tort claims to Blanas's suit for personal damages.[10] Blanas offers two arguments related to this matter. First, Blanas argues that equitable estoppel should block the running of the limitations period, see Groseth v. Ness, 421 P.2d 624, 630 (Alaska 1966), because the state lulled him into not filing his tort claims. Second, Blanas argues that his claims arise from contract, not tort.
Blanas's equitable estoppel claim cannot survive, because his evidence raises no genuine issue of fact.[11] Part of the evidence for this claim is a post trial affidavit. Because an appellate brief can neither append nor refer to evidence outside the record, this affidavit must be struck. L.L.M. v. P.M., 745 P.2d 599, 600 (Alaska 1987); see also Alaska R.App.P. 210. Blanas's other evidence is a memorandum dated October 31, 1986, which discussed the state's intent to resolve Blanas's claims through change orders or extra work orders and to resort to administrative review, judicial process, or arbitration if Blanas remained dissatisfied. This document offers no indication that the state lulled Blanas into not filing claims.
Furthermore, as the state notes, Blanas was on notice that the Department of Natural Resources had rejected most of his claims as of May 8, 1987, when the agency issued its claims decision. Yet Blanas did not file an action until March 1, 1990, almost three years after the decision.
Next, Blanas argues that the statute of limitations for tort claims does not apply because he has raised claims in contract, and that the six-year statute of limitations therefore applies.[12] As Judge Fabe correctly noted in her order on reconsideration, if Blanas's arguments were in contract, then he should have raised them in the administrative hearing, not in an original action before the superior court.[13]See *777 AS 44.77; State v. ZIA, Inc., 556 P.2d 1257, 1262-63 (Alaska 1976).
Because we affirm Judge Fabe's dismissal of Blanas's complaint as untimely, we need not address Blanas's other arguments.

V. CONCLUSION
Transamerica's claims for consequential damages lie in contract, not tort. The Division of Parks did not assume the duties of a design professional through its review of the project plans and specifications or its assignment of an on-site inspector. Moreover, Transamerica cannot state a tort claim for violation of the implied covenant of good faith and fair dealing. Therefore we affirm the superior court's grant of summary judgment dismissing Transamerica's tort claims.
Because Blanas filed his personal action after the two-year statute of limitations had run, his suit must also be dismissed. Blanas has not shown that the state should be equitably estopped from asserting a statute of limitations defense.
AFFIRMED.
NOTES
[1] AS 44.77.010(a) states, in part:

[E]very claim for reimbursement for money expended, or for compensation for labor, materials, or supplies furnished, or services given to or for the state, whether based on a contract or on a ratification, shall be promptly presented to the appropriate administrative or executive officer for approval and payment.
[2] AS 44.77.020(a) states, in part:

If the administrative or executive officer disallows all or part of the claim, the claimant may obtain a review of the officer's action by applying within 60 days to the Department of Administration... .
[3] According to Alaska Civil Rule 12(b)(6), "the following defenses may at the option of the pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted."
[4] Transamerica cites several cases from other jurisdictions that allow contractors to bring malpractice claims against design professionals. These cases make an architect or engineer liable in tort to a contractor for professional negligence, even if the harm caused is purely economic, where the design professional and the contractor have no contractual relationship and thus no privity. See, e.g., Donnelly Constr. Co. v. Oberg/Hunt/Gilleland, 139 Ariz. 184, 677 P.2d 1292, 1295-96 (1984). See generally Frank D. Wagner, Annotation, Tort Liability of Project Architect for Economic Damages Suffered by Contractor, 65 A.L.R.3d 249 (1975). This case law is not on point, because Blanas signed a construction contract with the Division of Parks and thus was in contractual privity with the state.
[5] Whether owners who review the plans of independent design professionals act as design professionals themselves is a question of law. We consider all questions of law de novo, and will adopt the rule of law that is most persuasive in light of precedent, reason, and policy. Ford v. Municipality of Anchorage, 813 P.2d 654, 655 (Alaska 1991).
[6] Transamerica also relies on a California case, Seaman's Direct Buying Serv., Inc. v. Standard Oil Co., 36 Cal.3d 752, 206 Cal. Rptr. 354, 363, 686 P.2d 1158, 1167 (1984). The Seaman's court allowed a tort action against a party who first breached a commercial contract and then litigated the question of the contract's existence, even though the party knew that it had no defenses. Id. 206 Cal. Rptr. at 363, 686 P.2d at 1167. We have not recognized a Seaman's tort in Alaska, and we decline to do so now.
[7] Transamerica argues that even if Akers applies, a tort remedy for bad faith breach is still available, because by failing to tell Blanas that no money was available to pay his extra cost claims, the Division of Parks committed the tort of nondisclosure, a traditionally recognized tort for purposes of the Akers rule. Although we recognize a cause of action in tort for "failure to disclose information when there is an affirmative duty to do so," Turnbull v. LaRose, 702 P.2d 1331, 1334 (Alaska 1985), Transamerica has not demonstrated that the Division had such a duty. Transamerica's evidence regarding the availability of funds pertains to Blanas's extra cost claims, not to any sums that the state had already promised to pay. Transamerica offers no evidence that the Division promised to pay any amount that Blanas deemed appropriate for extra work. In fact, from the start the state disputed the validity of many of Blanas's claims.

Transamerica's nondisclosure claims before Judge Fabe were based solely on the state's failure to disclose errors in the plans and specifications. Because Transamerica presents its current nondisclosure argument for the first time on appeal, and did not raise the same argument before the superior court, we need not address this claim. See Borrego v. State, Dep't of Pub. Safety, 815 P.2d 360, 366 & n. 13 (Alaska 1991).
[8] In 1990, Transamerica amended its complaint to add an indemnity claim that Samuel Combs had assigned to the company. On reconsideration, Judge Fabe allowed Transamerica to raise this claim in the administrative forum. Though the state objected at the trial court level to this treatment of the indemnity claim, the arguments in the state's briefs neither discuss nor dispute Judge Fabe's decision. The state therefore has waived this issue. See Petersen v. Mutual Life Ins. Co., 803 P.2d 406, 411 & n. 8 (Alaska 1990).
[9] According to AS 22.10.020(d), "[t]he superior court has jurisdiction in all matters appealed to it from a[n] ... administrative agency when appeal is provided by law."
[10] Under AS 09.10.070, "[n]o person may bring an action (1) for libel, slander, assault, battery, seduction, false imprisonment, or for any injury to the person or rights of another not arising on contract and not specifically provided otherwise ... unless commenced within two years."
[11] If the trial court considers materials outside the pleadings when deciding a motion to dismiss under Alaska Civil Rule 12, then the court must treat the motion as one for summary judgment. Reed v. Municipality of Anchorage, 741 P.2d 1181, 1184 (Alaska 1987). Judge Fabe treated the state's motion to dismiss Blanas's claim as one for summary judgment. Therefore, we must determine "whether there is a genuine issue of material fact and whether the moving party is entitled to judgment on the law applicable to the established facts." Sea Lion Corp. v. Air Logistics of Alaska, 787 P.2d 109, 116 (Alaska 1990). From the materials presented, we make all reasonable inferences of fact in favor of the nonmoving party. Id.
[12] According to AS 09.10.050, "[n]o person may bring an action (1) upon a contract or liability, express or implied ... unless commenced within six years."

Blanas also argues that AS 12.10.020 gives him a three-year limitations period in which to make his claim. As the state correctly notes, AS 12.10.020 governs criminal fraud actions, not civil ones, and is inapplicable here. At any rate, Blanas raised this issue for the first time on appeal, and therefore this court should not consider it. State v. Northwestern Constr., Inc., 741 P.2d 235, 239 (Alaska 1987).
[13] At oral argument, Blanas also claimed that under Alaska's "discovery rule," the statute of limitations did not start to run until he learned of the state's tortious activity. See Lee Houston & Assocs., Ltd. v. Racine, 806 P.2d 848, 851 (Alaska 1991). Though he raised this issue before Judge Fabe and in his points on appeal, Blanas gives it only cursory treatment in his appellate briefs. Therefore, we shall treat this claim as abandoned. See Gates v. City of Tenakee Springs, 822 P.2d 455, 460 (Alaska 1991). Furthermore, Judge Fabe properly concluded that "[b]ecause the Blanases knew of their business losses by June 1987 and had been pursuing remedies for faulty plans, ... a reasonable person would have been on notice of the misrepresentation and fraud claims by June, 1987."