Herb and Marge HANCOCK, Individual-
ly, and H & M Construction,
Appellants and Cross–Appellees,

v.

Carol A. NORTHCUTT and Melvin D.
Northcutt, Appellees and
Cross–Appellants.

Nos. S–3470, S–3483.

Supreme Court of Alaska.

Jan. 18, 1991.

As Amended on Denial of Rehearing
April 8, 1991.

Kelly C. Fisher, Pletcher, Weinig, Lottridge & Moser, Anchorage, for appellants and cross-appellees Hancocks.

Thomas H. Dahl, Phyllis A. Hartke, Dahl and Hartke, Anchorage, for appellees and cross-appellants Northcutts.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Chief Justice.

### STATEMENT OF THE FACTS

This case involves a dispute between the owner-builders of an earth-sheltered concrete house, Carol and Melvin Northcutt, and the concrete contractors for the house, Herb and Marge Hancock. The house consists of seven joined pods which may be covered with dirt for insulation. The Northcutts made an oral contract with the Hancocks for construction of the pods. The terms of the contract are in dispute.

The Northcutts claim that for $65,000 the Hancocks agreed to complete all structural concrete work. The Hancocks dispute the original price, and claim that they performed extra work not contemplated in the original contract, for which they were to be paid on a time and material basis. Construction was delayed. Each side blames the other for the delay. Following delays, all seven pods were poured. The Northcutts believed some of the work to be defective. The Hancocks offered to cure the problems but the Northcutts refused, ordering them off the job.

The Hancocks then filed a lien for $13,100 and sued to enforce the lien. The suit was dismissed because the Hancocks had not complied with the registration requirements for contractors in Alaska.

The Northcutts then sued the Hancocks. The Northcutts' amended complaint states that the Hancocks breached the contract by failing to perform in a timely and professional manner, and by changing the design of the Northcutts' structure. In addition, the Northcutts allege that the Hancocks wrongfully liened the property. The Northcutts also plead a tort claim for misrepresentation and negligent and intentional infliction of emotional distress. The Northcutts claim that the house leaks and that it is structurally unsafe. The Northcutts sought damages associated with the costs to repair the house, and for emotional distress. They also asked for punitive damages. The Hancocks counterclaimed for the amount allegedly due under the contract plus extra work performed.

The contract was made in May of 1982. The Hancocks first poured concrete in September of 1982 and made their last pour on October 30, 1982. The Hancocks were ordered off the job prior to filing a lien in November of 1982. The Northcutts finished the house and closed on their $160,000 mortgage about 90 days later. They have lived in the house since that time. However, they do not occupy pod seven because they believe it may collapse and they have installed timber cribbing in certain sections of the house to prevent a sudden collapse. This action was brought on September 15, 1984. After lengthy motion practice the case went to trial in March of 1989. Following a four-week trial, the jury returned a verdict in favor of the Northcutts.

The jury, guided by a special verdict form, awarded the Northcutts $455,984 as the cost of demolishing and rebuilding the house, $19,600 for moving and storage costs and temporary housing during reconstruction, $7,200 for past lost use of portions of the house, $28,486 for costs incurred by construction delays, and $175,000 for emotional distress. Compensatory damages thus totaled $686,271.[1] This amount plus prejudgment interest, costs and attorney's fees was entered as a judgment against the Hancocks.

The Hancocks appeal. They assert that the judge erred in allowing the Northcutts to pursue their claim for emotional distress damages and in instructing the jury that it could award the Northcutts the cost of demolishing and replacing the house, even if it determined that replacement would constitute economic waste. The Hancocks also allege that various aspects of the conduct of the jury require the decision to be reversed.

The Northcutts have filed a cross-appeal, arguing that the trial court erroneously dismissed their tort claims for misrepresentation and intentional infliction of emotional distress. They also claim that the court erred in refusing to allow the issue of punitive damages to go to the jury. In addition, they claim that the court erred in its award of costs and attorney's fees to them and in restricting recovery of prejudgment interest.

DISCUSSION

A. HANCOCKS' APPEAL

1. *Did the trial court's instruction concerning demolition and rebuilding costs constitute prejudicial error?*

The trial court instructed the jury on alternative methods of computing dam-

---

1. The jury also awarded $1 for lost aesthetic value.

ages. Instruction 40 told the jury in general that if repair was feasible, the reasonable cost of putting the house in the condition promised by the contract should be the measure of damage. If, however, repair was not feasible, the jurors were told to award the difference between the value the house would have had if it had been built as promised and the actual value of the house. The jury was also instructed that even if repair was impractical and grossly wasteful, the cost of the repair method could be used if the jury found any one of the following: (1) that the house has a special significance to the Northcutts; (2) that the Northcutts were more likely than not to demolish and rebuild the house; or (3) that the house creates a dangerous condition.[2]

The jury, in answer to the questions posed in the special verdict form, found that it would be impractical and grossly wasteful to put the house in the same condition it would have been in had the Hancocks kept their promise. However, the jury also found that at least one of the three conditions existed. It thus awarded the Northcutts $455,894 as the "reasonable cost to put the house in the condition it would have been in had the defendants kept their promise." The parties agree that this represents the sum of $68,465 for removing the present house and $387,519 for rebuilding the house.

The Hancocks contend that the instruction is erroneous because the jurors should have been told that if expending funds to construct the house as contracted for would be impractical and grossly wasteful, damages should be the difference between what the house would have been worth if the contract had not been broken and its actual value, plus consequential damages. The Hancocks note that the most the house would have been worth if it had been properly built was $190,000[3] as of the time of its completion in 1982. As of the time of trial, because of a depressed real estate market, the house would have been worth approximately $142,500.

The Northcutts contend that the instruction was a correct reflection of the law.[4]

---

2. Instruction 40 stated:

The second item of claimed loss is the cost to repair the construction deficiencies which plaintiffs claim can only be repaired by demolishing the present structure and rebuilding the entire house.

If you find that repair is feasible, you must compute the reasonable cost of putting the house in the condition which was promised by the contract. If you find that repair is not feasible, you must compute the reasonable difference between the value the house would have had if it had been built as promised, and the value the house actually has. In other words, there are two differen[t] methods which can be used to decide the amount of plaintiffs' claimed damages.

The usual way of deciding what damages to award to the plaintiffs is to give them the reasonable cost of putting the house in the same condition it would have been in had the defendants kept their promise.

However, if you find that it would be impractical and grossly wasteful, in proportion to the benefit to be gained, to repair the house so that it matches its promised condition, then you should not use this first method unless you find it is more likely than not true:

1) the house has a special significance to the plaintiffs; or

2) the plaintiffs are more likely than not to demolish and rebuild the house; or

3) the house as is creates a dangerous condition.

If you find one or more of the above conditions to be more likely true than not true, you may determine that cost of repair is the approximate measure of damages in this case.

Otherwise, for all conditions that can be repaired at disproportionate and wasteful expense, you should use the following method of measuring damages. You should award to the plaintiffs a sum which represents the difference between the value of the performance that the defendants promised and the value of the performance that the defendants actually gave.

If you decide that some defects are repairable, but that others can be repaired only at a disproportionate and wasteful expense, then you should use the cost of repair to measure damages for the repairable defects and the drop in value to measure the damages for the remaining non-repairable defects.

3. The value of the lot is in addition to this amount.

4. The Northcutts also argue that even if the instruction was erroneous, it could not have caused prejudice because the value differential approach should not have been instructed upon as there was no evidence of the present value of the house. This lacks merit. There was evidence that the structure is unsafe and must be

In our view, the instruction was a misstatement of the law. In *Advanced, Inc. v. Wilks*, 711 P.2d 524 (Alaska 1985), a case which involved another earth-sheltered concrete house, we approved a jury instruction which told the jury that damages should be the reasonable cost of remedying construction defects unless such costs were impractical and grossly wasteful, in which case a difference in value approach should be used. We stated:

> It is well established that the cost of completion or repair is the preferred measure for calculating damages when a building contractor breaches a construction contract by incomplete or defective performance.... The diminution in value measure is to be used only when necessary to avoid unreasonable waste (as where a house would have to be torn down to replace plumbing that deviated only in a minor way from contract specifications).

*Id.* at 526 (footnote omitted).

██ We went on to explain that an owner's recovery should not necessarily be limited to diminution in value "whenever that figure is less than the cost of repair." *Id.* at 527. In support of this we cited RESTATEMENT (SECOND) OF CONTRACTS § 348, comment c (1981). This comment makes it clear that while a cost of repair figure somewhat in excess of damages under the comparative value approach may be tolerated because of proof difficulties, a gross excess will not be. The comment states, in relevant part:

> Sometimes, especially if the performance is defective as distinguished from incomplete, it may not be possible to prove the loss in value to the injured party with reasonable certainty. In that case he can usually recover damages based on the cost to remedy the defects. Even if this gives him a recovery somewhat in excess of the loss in value to him, it is better that he receive a *small windfall* than that he be undercompensated by being limited to the resulting diminution in the market price of his property.

> Sometimes, however, such a large part of the cost to remedy the defects consists of the cost to undue what has been improperly done that the cost to remedy the defects will be clearly disproportionate to the probable loss in value to the injured party. Damages based on the cost to remedy the defects would then give the injured party a recovery greatly in excess of the loss in value to him and result in a substantial windfall. Such an award will not be made. It is sometimes said that the award would involve "economic waste," but this is a misleading expression since an injured party will not, even if awarded an excessive amount of damages, usually pay to have the defects remedied if to do so will cost him more than the resulting increase in value to him.

(Emphasis added.)

The three exceptions the trial judge included in Instruction 40 were based on additional language in *Wilks*. We stated:

> It is true that in a case where the cost of repair exceeds the damages under the value formula, an award under the cost of repair measure may place the owner in a better economic position than if the contract had been fully performed, since he could pocket the award and then sell the defective structure. On the other hand, it is possible that the owner will use the damage award for its intended purpose and turn the structure into the one originally envisioned. He may do this for a number of reasons, including personal aesthetics or a hope for increased value in the future. If he does this, his economic position will equal the one he would have been in had the contractor fully performed. The fact finder is the one in the best position to determine whether the owner will actually complete performance, or whether he is only interested in obtaining the best immediate economic position he can. In some cases, such as where the property is held solely for investment, the court may conclude as a matter of law that the damage award cannot exceed the diminu-

demolished. The jury could infer from this that

at present the house has a negative value.

tion in value. Where, however, the property has special significance to the owner and repair seems likely, the cost of repair may be appropriate even if it exceeds the diminution in value.[6]

> [6] The public interest in avoiding the creation of eyesores and possibly dangerous conditions may also work in favor of the cost role. Of course, absent a decree of specific performance, there is no guarantee that the owner will actually use the award to fix the structure, but, as just discussed, in some cases it may be probable that he will do so.

*Id.* at 527 (other footnote omitted).

In *Wilks,* the jury explicitly found that the cost to cure the house defects would not be grossly wasteful. *Id.* at 526. The discussion does not purport to state an exception to the rule that cure costs cannot be awarded if there is unreasonable waste.

There is, however, a theoretical basis for awarding cost to cure damages which greatly exceed the value differential measure, although cases where this has actually been done are rare. What is required are assurances that the injured party will effect a cure for legally sufficient reasons. A hornbook on contracts states:

> It is usually said that this second measure of recovery [value differential damages] is appropriate "[i]f it is made to appear that physical reconstruction and completion in accordance with the contract will involve unreasonable economic waste by destruction of usable property or otherwise." *It seems apparent however, that the true rationale is that recovery for the cost of remedying the defect would involve unjust enrichment.* In all likelihood, if the owner were to recover this amount in such circumstances he would pocket the recovery. Most likely he would not undertake to remedy the defect.... The end result would be that the owner would have a structure substantially in compliance with the contract and a sum of money far in excess of the pecuniary harm done to him. Economic waste, then, is merely

a criterion by which one can determine whether or not the owner reasonably would remedy the defect or would utilize the building in its defective state. Another criterion is whether the owner's purpose is to gratify personal taste and fancy. If so, he may be entitled to damages measured by the cost of completion *even if this involves economic waste.*

J. Calamari and J. Perillo, *Treatise on Contracts* § 14–29, at 560–61 (1977) (emphasis added) (footnotes omitted). *See also* Note, *Breach of a Covenant to Restore,* 39 So. Cal.L.Rev. 309, 315 (1966) (restoration costs should only be awarded if the injured party restores).

Accordingly, if warranted by the evidence, an instruction like that in question might be proper if it required a finding that the injured party would probably rebuild. Thus, if the instruction were to state that cost of cure damages were appropriate, even if grossly wasteful, if the house has special significance to the plaintiffs *and* the plaintiffs are more likely than not to demolish and rebuild the house, it would not be erroneous. The same is true if the instruction were to say that if the house is dangerous *and* the plaintiffs are more likely than not to demolish and rebuild it, cost of cure damages could be awarded. However, the exceptions in Instruction 40 are stated in the disjunctive.[5] Thus the jury could have found merely that the house creates a dangerous condition, or that the house has special significance to the plaintiffs, without also finding that the plaintiffs are more likely than not to demolish and rebuild it.

The instruction as given therefore allows the possibility of unjust enrichment of the plaintiffs. Assuming their house to have no value, their loss is $190,000, which is what their house would have been worth in 1982 had it been built properly, plus demolition costs of $68,465. The jury awarded them $387,519 plus the costs of demolition. They can now demolish their house, buy another house comparable in size for $190,-

5. In *Wilks* we spoke of the factors of special significance and the likelihood of repair in the conjunctive: "Where, however, the property has special significance to the owner *and* repair seems likely, the cost of repair may be appropriate even if it exceeds the diminution in value." *Wilks,* 711 P.2d at 527 (emphasis added).

000 ($142,500 using values as of the time of trial) and profit by $197,519. On the facts of this case, this seems likely. Neither Mrs. nor Mr. Northcutt testified that they would rebuild an earth-sheltered concrete house given another chance.

■ For this reason, the jury's award of $387,519 as the cost of rebuilding the house must be vacated.[6] The jury's award of storage costs and temporary housing during reconstruction must also be reversed as these items necessarily assume that the house will be rebuilt.

> 2. *Did the trial court err in instructing the jury that it could award damages for emotional distress?*

The trial court instructed the jury that if the Hancocks were negligent in the performance of their duties under the contract and that this caused the Northcutts emotional distress, damages for emotional distress could be awarded.[7]

In the special verdict, the jury affirmatively answered Question 9: "Was the negligence of the defendants a legal cause of harm to the plaintiffs?" The jury was then asked: "What is the amount of money which will fairly compensate plaintiffs for the emotional and mental distress legally caused by defendants' negligence?" and answered, "$175,000."

The Hancocks argue, in essence, that no recognized legal theory warrants the award of emotional distress damages in this case, as the Northcutts were not physically injured and the distress did not itself have physical manifestations.

■ The general rule is that where a tortfeasor's negligence causes emotional distress without physical injury, such damages may not be awarded. W. Prossor and W. Keeton, *The Law of Torts* § 54, at 361 (5th ed. 1984) ("Where the defendant's negligence causes only mental disturbance, without accompanying physical injury, illness, or other physical consequences, and in the absence of some other independent basis for tort liability, the great majority of courts still hold that in the ordinary case there can be no recovery.").

We have recognized the application of this rule in several cases in which we have discussed the claims of plaintiffs who have suffered emotional distress upon observing a loved one who has been physically injured by the act of a tortfeasor. *Mattingly v. Sheldon Jackson College*, 743 P.2d 356 (Alaska 1987); *Croft v. Wicker*, 737 P.2d 789 (Alaska 1987); *Tommy's Elbow Room, Inc. v. Kavorkian*, 727 P.2d 1038 (Alaska 1986). In those cases we recognized an exception to the general rule where the plaintiff is shocked by observing the physically injured victim "more or less contemporaneously with the plaintiff's learning of the nature of the victim's injuries." *Mattingly*, 743 P.2d at 365–66. This exception has no application to the present case.

■ We have also implicitly recognized the application of the general rule in our cases discussing the elements of a claim for intentional infliction of emotional distress, *King v. Brooks*, 788 P.2d 707 (Alaska 1990); *Teamsters Local 959 v. Wells*, 749

---

**6.** The demolition costs found by the jury, $68,465, may stand as both parties agree that this is the amount found by the jury for demolition and that the jury necessarily found that the house was not structurally sound and "was going to have to be replaced and had no value." Under such circumstances, the demolition costs are consequential damages which may be recovered in addition to the diminution in value measure. RESTATEMENT (SECOND) OF CONTRACTS § 347(b) (1981).

**7.** Instruction 42 states:

The plaintiffs' eighth item of claimed loss is the emotional and mental distress caused by the defendants' negligence. This is the emotional and mental distress associated with any pain, fear, anxiety, embarrassment, or humiliation resulting from the negligence. You may award a fair amount to compensate plaintiffs for any loss of this type experienced from the date of the contract until the date of trial, and for any similar loss they may experience in the future if you decide there is a reasonable medical probability that they may experience such a loss in the future.

The law does not establish a definite standard for fixing the amount of compensation for loss of this type. The law does not require that any witness testify as to what amount would be reasonable. You may fix a fair amount in light of the evidence and your experience and reasonable judgement.

P.2d 349 (Alaska 1988); *Croft v. Wicker*, 737 P.2d 789 (Alaska 1987); *Richardson v. Fairbanks North Star Borough*, 705 P.2d 454 (Alaska 1985). These authorities limit the recovery of emotional distress damages unaccompanied by physical injuries to cases (1) where the emotional distress is "severe," (2) where the conduct of the tortfeasor is intentional or reckless, and (3) where such conduct is capable of being characterized as extreme or outrageous. *King v. Brooks*, 788 P.2d at 711; *Wells*, 749 P.2d at 357. The last two limitations would be meaningless if negligent infliction of emotional distress without physical harm was legally redressable.

■ The Northcutts cite several cases, including one from Hawaii, *Rodrigues v. State*, 52 Haw. 156, 283, 472 P.2d 509, 518–21 (1970), which discarded the general rule that there can be no recovery for negligent infliction of emotional distress in the absence of physical injury. However, they make no argument as to why this court should abandon the general rule and, on the briefing before us, we decline to consider this possibility.

The Northcutts also contend that emotional distress damages are allowable in the absence of bodily injury under a breach of contract theory. They cite section 353 of the RESTATEMENT (SECOND) OF CONTRACTS which states:

> Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result.

The first illustration to section 353 demonstrates that in the view of the RESTATEMENT, contracts to construct a house are not among those where serious emotional disturbance is particularly likely. The illustration states:

> A contracts to construct a house for B. A knows when the contract is made that B is in delicate health and that proper completion of the work is of great importance to him. Because of delays and departures from specifications, B suffers nervousness and emotional distress. In an action by B against A for breach of contract, the element of emotional disturbance will not be included as loss for which damages may be awarded.

The view that contracts pertaining to one's dwelling are not among those contracts which, if breached, are particularly likely to result in serious emotional disturbance is reflected in numerous cases. *E.g., Mack v. Hugh W. Comstock Associates, Inc.*, 225 Cal.App.2d 583, 37 Cal.Rptr. 466, 469 (1964); *Maere v. Churchill*, 116 Ill. App.3d 939, 72 Ill.Dec. 441, 452 N.E.2d 694 (1983); *Groh v. Broadland Builders, Inc.*, 120 Mich.App. 214, 327 N.W.2d 443 (1983); *Caradonna v. Thorious*, 17 Mich.App. 41, 169 N.W.2d 179 (1969); *Jankowski v. Mazzotta*, 7 Mich.App. 483, 152 N.W.2d 49 (1967); *Young v. Abalene Pest Control Services, Inc.*, 122 N.H. 287, 444 A.2d 514 (1982); *Emerman v. Baldwin*, 186 Pa.Super. 561, 142 A.2d 440 (1958). There is contrary authority as well, *B & M Homes, Inc. v. Hogan*, 376 So.2d 667 (Ala.1979); *Jack v. Henry*, 128 So.2d 62 (La.App.1961).

In our view, breach of a house construction contract is not especially likely to result in serious emotional disturbance. Such contracts are not so highly personal and laden with emotion as contracts where emotional damages have typically been allowed to stand on their own. Examples of the latter include contracts to marry,[8] to conduct a funeral,[9] to sell a sealed casket,[10] to conduct a cesarean birth,[11] to surgically rebuild a nose,[12] to provide promised mater-

8. *See* A. Corbin, *Contracts* § 1076, at 430–31 & n. 8 (1964); *e.g., Vanderpool v. Richardson*, 52 Mich. 336, 17 N.W. 936 (1883).

9. *Fitzsimmons v. Olinger Mortuary Assoc.*, 91 Colo. 544, 17 P.2d 535 (1932); *see also Meyer v. Nottger*, 241 N.W.2d 911 (Iowa 1976).

10. *Lamm v. Shingleton*, 231 N.C. 10, 55 S.E.2d 810 (1949); *see also Hirst v. Elgin Metal Casket Co.*, 438 F.Supp. 906 (D.Mont.1977); *Chelini v. Nieri*, 32 Cal.2d 480, 196 P.2d 915 (1948).

11. *Stewart v. Rudner*, 349 Mich. 459, 84 N.W.2d 816 (1957).

12. *Sullivan v. O'Connor*, 363 Mass. 579, 296 N.E.2d 183 (1973).

nity medical coverage,[13] to provide medical services,[14] and to keep a daughter informed of her mother's health.[15] Further, the typical damages for breach of house construction contracts can appropriately be calculated in terms of monetary loss. By contrast, the damages in contracts of a more personal nature in which emotional disturbance damages are allowed are usually intangible. Thus, there would ordinarily be only a nominal recovery unless emotional disturbance damages were allowed.

For the above reasons, we conclude that the court should not have instructed on emotional distress damages in this case. The $175,000 awarded by the jury for these damages should be deleted from the judgment.

### 3. *Jury Conduct Claims*

■ The Hancocks' first claim is that the trial judge should have discharged a juror who thought that he had spoken to the Northcutts about their case at a party. The trial judge conducted voir dire of the juror and was satisfied that the juror had misidentified the people to whom he spoke as the Northcutts. Following the trial court's voir dire, the Hancocks did not request any relief and did not request to conduct further voir dire. Under these circumstances, this point is waived. *See Grimes v. Haslett,* 641 P.2d 813, 816 (Alaska 1982); *cf. Alaska State Housing Auth. v. Riley Pleas, Inc.,* 586 P.2d 1244, 1248 (Alaska 1978) (a party may not obtain a second hearing by silently collecting his objections for the contingency of loss in the first one).

■ The Hancocks' other point under this heading is that the trial court should have granted a new trial because of juror misconduct. They base this point on juror affidavits gathered by the Northcutts in opposition to post-trial motions made by the Hancocks. The affidavits, however, detail the jurors' mental processes and do not demonstrate that there was any outside influence improperly brought to bear on any juror or that extraneous prejudicial information was improperly brought to the jury's attention. Thus the court did not err in refusing to grant a new trial on this basis. *See West v. State,* 409 P.2d 847, 852 (Alaska 1966); Evidence Rule 606.

### B. NORTHCUTTS' CROSS–APPEAL

1. *Should the trial court have instructed the jury on misrepresentation, intentional infliction of emotional distress, and punitive damages?*

■ The trial court found insufficient evidence of malicious or outrageous conduct on behalf of the Hancocks to warrant an instruction on either intentional infliction of emotional harm or punitive damages.[16] We agree with the trial court that although there is ample evidence that the Hancocks' performance of the contract was deficient, there is insufficient evidence that they acted maliciously or in any sense outrageously.

■ The Northcutts also claim that the trial judge should have given an instruction on the tort of misrepresentation. Such an instruction, they claim, would support an award not only of punitive damages but damages for emotional distress. In our view this argument does not benefit the Northcutts. As noted, there is insufficient evidence of malice or outrageous conduct on the part of the Hancocks to support a claim for intentional infliction of emotional distress or punitive damages. This applies also to the representations which the Hancocks made when the contract was formed. Thus, instructing the jury on a theory of misrepresentation would not have warranted an instruction on punitive damages or

---

13. *McCune v. Grimaldi Buick–Opel, Inc.,* 45 Mich.App. 472, 206 N.W.2d 742 (1973).

14. *Oswald v. LeGrand,* 453 N.W.2d 634 (Iowa 1990); *Speck v. Finegold,* 497 Pa. 77, 439 A.2d 110 (1981).

15. *Avery v. Arnold Home, Inc.,* 17 Mich.App. 240, 169 N.W.2d 135 (1969).

16. The trial court stated that "there has been absolutely no evidence even remotely establishing the degree of willful, wanton, outrageous conduct necessary to support such a claim...."

emotional distress damages on an intentional infliction theory. Further, negligent misrepresentation concerning the qualities of a house to be built will not support an award of emotional distress damages in the absence of physical injury for the reasons set forth in part A–1 above. Finally, any damages which the jury might properly have awarded based on a misrepresentation theory were also equally awardable under the negligent performance of contract duties theory which was instructed on. Thus, any error in not instructing on misrepresentation was harmless.

## C. COSTS AND ATTORNEY'S FEES

The Northcutts submitted a cost bill which totalled $85,821.67. They were awarded $35,409.83 by the clerk of court. They unsuccessfully appealed this award to the superior court.

The standard of review on cost awards was expressed in *CTA Architects of Alaska, Inc. v. Active Erectors & Installers, Inc.*, 781 P.2d 1364, 1365 (Alaska 1989):

> To the extent that an award of costs is consistent with the legal principles adopted by this court, the award is committed to the broad discretion of the trial court and will not be disturbed on appeal, absent a clear showing that the trial court's determination was arbitrary, capricious or manifestly unreasonable, or that it stemmed from an improper motive.

The court's action in denying the appeal of the Northcutts concerning costs meets this standard and is thus affirmed.

 The trial court awarded the Northcutts attorney's fees of $88,169.66 in accordance with the schedule of fees set forth in Civil Rule 82. The Northcutts actually incurred fees of $394,318.75. They argue that the court should have awarded them a higher attorney's fee because of the length and complexity of this litigation. Although the trial judge in the exercise of her discretion could have awarded a larger fee, adhering to the Civil Rule 82 schedule was not an abuse of discretion.[17] Nonetheless, we must vacate the award in this case because part of the money judgment on which the scheduled fee is based has been vacated.

## D. PREJUDGMENT INTEREST

The trial court declined to award prejudgment interest on the demolition and repair costs and on moving, storage, and temporary housing costs which would be necessitated during reconstruction. The Northcutts contend that this was error.

The argument is moot with respect to the cost of rebuilding the house, as this will be deleted from the judgment. The argument is also moot with respect to temporary housing and storage, because, as noted above in section A–1, those are items of consequential damages which are dependent on the erroneous assumption that the house will be rebuilt. However, the argument is not moot with respect to demolition and moving costs.

The Hancocks argued that these costs were calculated in 1989 dollars and thus awarding prejudgment interest from the date of the breach in 1982 would be, in essence, granting a double recovery because of the inflation which occurred between 1982 and 1989. The trial judge gave no reason for her decision, but apparently accepted this argument. In *Sebring v. Colver*, 649 P.2d 932, 936 (Alaska 1982), we reversed the award of prejudgment interest for repair costs which were calculated in date-of-trial, 1979, dollars from a 1975 breach. We stated:

> Since the financial impact of the passage of time was thus incorporated into the jury's damage award, any award of prejudgment interest on this amount would therefore constitute a double recovery.

The Northcutts argue that this rationale is inapplicable in the present case because the relevant prices in 1989 are not greater than those which existed in 1982. The Northcutts offer no factual basis for this argument. Similarly, the Hancocks have submitted nothing to this court or the trial court to indicate that demolition and moving costs in Anchorage were greater in 1989 than they were in 1982.

---

**17.** *See Municipality of Anchorage v. Sisters of Providence in Washington, Inc.,* 628 P.2d 22, 35 (Alaska 1981).

Prejudgment interest should be denied in only the most unusual case, *American National Watermattress Corp. v. Manville*, 642 P.2d 1330, 1343 (Alaska 1982). Since prejudgment interest is the norm in our law, the burden of proving that an unusual situation, such as a resulting double recovery, exists should be on the party opposing the award, here the Hancocks. As they have not proven that there will be a double recovery in this case, an award of prejudgment interest should have been made.

CONCLUSION

For the above reasons, the judgment is reversed with respect to the award of rebuilding, storage and temporary housing costs, and damages for emotional distress. The court's refusal to award prejudgment interest on demolition and moving costs is reversed. The court's award of attorney's fees is vacated. In all other respects the judgment of the superior court is affirmed. The case is remanded for a new trial to determine the value the house would have had if it had been built as promised. Since the jury found that the house as built had no value, this will represent damages under the difference in value approach.