NOME COMMERCIAL COMPANY, an Alaska corporation, S. Wayne Brown, and Carrol A. Brown, Appellants,

v.

NATIONAL BANK OF ALASKA, a national banking association, Appellee.

NOME COMMERCIAL COMPANY, an Alaska corporation, S. Wayne Brown, and Carrol A. Brown, Appellants,

v.

Vickey HIGASHI, individually and as Personal Representative of the Estate of Gregory Higashi, Appellee.

Nos. S–6980, S–7320.

Supreme Court of Alaska.

Oct. 10, 1997.

Rehearing Denied Jan. 6, 1998.

Timothy R. Byrnes, Hughes, Thorsness, Gantz, Powell & Brundin LLC, Anchorage, for Appellants.

David Floerchinger, Deirdre D. Ford, DeLisio, Moran, Geraghty & Zobel, Anchorage, for Appellee National Bank of Alaska.

C.R. Kennelly, Stepovich, Kennelly & Stepovich, P.C., Anchorage, for Appellee Vickey Higashi.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

## OPINION

MATTHEWS, Justice.

### I. INTRODUCTION

In 1989 the Browns and the Higashis entered into an agreement concerning the Browns' liquor store. The Browns contend it was a management agreement; Vickey Higashi alleges it was a sales agreement. All the documentary evidence supports the Browns' position, including sworn statements by the Higashis. We reverse the superior court's denial of the Browns' motion for directed verdict, because no reasonable juror could find that the parties entered into an agreement to sell the store.

In the companion case, Nome Commercial Company (NCC) sued the National Bank of Alaska (NBA) for breach of contract. The superior court held that a stakeholder cannot be liable for damages that occur after an interpleader action is filed. A stakeholder does not become immune to suit for damages occurring after filing an interpleader action, if the damages were caused by the stakeholder's independent, pre-interpleader activities. We reverse the directed verdict entered against NCC.

### II. FACTS AND PROCEEDINGS

#### A. NCC v. Higashi

In 1989 the Browns owned both the Stop Shop & Save and the Nome Liquor Store.[1] Mr. Higashi managed both stores. Mrs. Higashi worked at the Stop Shop & Save as a part-time clerk.

In November 1989 the Browns completed a sale of the Stop Shop & Save. They decided to move to Snohomish, Washington. The parties disagree about what happened next.

The Browns allege that they offered Mr. Higashi a position as manager of the Nome Liquor Store in November 1989. Mr. Higashi accepted the offer; the management fee would be the net income Mr. Higashi could earn for NCC. This management agreement was functionally a lease of the business. At termination of the agreement, an inventory accounting would provide final management compensation. The terms were memorialized in corporate minutes.[2]

---

1. NCC, dba Nome Liquor Store, was incorporated in March 1988 as an entity that would own the liquor license and operating assets. Mr. and Mrs. Brown each own fifty per cent of NCC's stock.

2. The minutes of the meeting held December 10, 1989 read:

 It was pointed out that the simplest solution would be to sell the Corporation's assets to the Higashis, transfer the liquor license to them, and at the same time, assign to them the prop-

Mrs. Higashi claims that the Browns sold the liquor store to her and her husband as of December 1, 1989. The agreement required the Higashis to pay for the inventory on hand at takeover, the cash in the tills and safe, and the money in NCC's bank account, and to sign a five-year lease at $15,000 a month on the building that was owned by the Browns. The Higashis would run the business as their own until they paid for the inventory, at which time the liquor license would be transferred to their names. This agreement was not put in writing.

The Browns added the Higashis as authorized signators on NCC's operating account at NBA. The signature card shows that the Browns remained authorized to utilize the account. Minutes of a shareholders' meeting dated December 14, 1989, explain that "the Shareholders and Board of Directors had passed resolutions which would leave Greg and Vickey Higashi in charge of the Nome Liquor Store operation," and "that Greg and Vickey Higashi be added as check signers on the Corporate Bank Account." These minutes also indicate that the Alaska Liquor Control Board would be notified that the Higashis had been elected officers of the corporation,[3] and granted permission to Mr. Higashi to operate a pull-tab business "so long as [it is] done independently of Nome Commercial Company, and Nome Liquor Store."

The Browns continued to be responsible to pay the vendors for the inventory on hand at the time of the agreement. Mr. Higashi ordered inventory with Mr. Brown's continuing personal guarantees to the liquor vendors. On December 14, 1989, Mr. Brown wrote to his vendors:

We are pleased to announce the appointment of Greg and Vickey Higashi to the position of Vice–President, General Manager, and Vice–President, Assistant General Manager, respectively, for Nome Liquor Store.

This appointment is effective December 1, 1989, and I hope you will extend to them the same service and assistance you have provided me over the years.

Carrol and I are moving back to our home in Snohomish, Washington, and are looking forward to taking it easy for the next year.

To insure timely payment of all future invoices would you please change your records to reflect our new address....

In December 1990 and 1991 Mr. Higashi signed liquor license applications for Nome Liquor Store. On both applications, the Browns are shown as the sole owners of NCC, dba Nome Liquor Store. Mr. Higashi signed both applications under oath; Mrs. Higashi signed the 1990 application also. On August 31, 1992, Mr. Higashi filed a sales statement with the city of Nome, stating

---

erty lease now held by the Corporation. The consideration to the Corporation would be relief from the lease obligation, and monetary consideration for the value of the assets sold.

Once the sale of the assets, and transfer of the lease and liquor license were completed the Corporation could dissolve if that were determined to be desirable.

The Higashis noted that they were unable to purchase the assets of the Corporation for cash. Moreover, they expressed reservations about being able to operate at a profit high enough to cause them to want to stay in Nome and operate the store, much less buy the store. Consequently, the Corporation would be unwilling to transfer the lease and liquor license until the terms of a sale could be fully worked out, and it was also pointed out that C.J. and Rosemary Phillips would also have to approve any sale or transfer of the property as well as the liquor license. There was also a question of how the State of Alaska, Liquor Control Laws would affect such a transaction.

... Acting upon the advice of counsel and on motion duly made, seconded, and unanimously carried, it was

RESOLVED to allow the Higashis to operate the Corporation's Liquor Store, and all other assets associated with the Nome Liquor Store Operation in Nome, Alaska, as Vice–President General Manager, and Vice–President Assistant Manager, in consideration for a deposit in an amount equal to the value of the inventory determined by a physical inventory to be $132,746.00, and payment of the Corporation's monthly lease obligation of $15,000.00. The remainder of all profits generated by the Higashis' management and operation of the store would be paid to them as compensation....
Mrs. Higashi suggests these corporate minutes are fabricated.

3. A letter dated December 15, 1989, and addressed to the Control Board, advised the Board that there was a change in corporate officers for the liquor store, but that "[t]here was no change in corporate ownership."

under penalty of perjury that he was Vice–President of NCC.

The Browns did some of NCC's bookkeeping and accounting from Snohomish. On December 8, 1990, Mr. Brown wrote to C.J. and Rosemary Phillips, who had sold the store to the Browns and retained a security interest in it, explaining that the Browns had moved out of Nome, but "left the liquor store in really capable hands."

According to Mr. Brown, he approached Mr. Higashi in 1991 with an offer to sell NCC and the real estate for a price of $1,458,274. Mr. Higashi was not interested. The Phillips, who had to consent, indicated they would not.

Mrs. Higashi disputes Mr. Brown's testimony. She testified that in February 1991 Mr. Brown told the Higashis that the lease would be prepared and the liquor license would be transferred into the Higashis' names.

The parties met in Cabo San Lucas, Mexico, in February 1991. Mr. Brown sent the Higashis a memorandum summarizing the meetings held there. According to the memorandum, the discussions focused on "various operating considerations for the liquor store." Mr. Brown also wrote, "We next discussed the need to formalize our operating arrangement, and we agreed to proceed with the drafting of a long term lease which when executed would also cause the liquor license to be transferred in compliance with applicable state law."

Mr. Higashi died on October 19, 1992. Mr. Brown flew to Nome to manage the store while Mrs. Higashi attended the funeral in Oregon. When she returned, she and her brother met with Mr. Brown.

Again, the parties disagree about what happened at this meeting. The Browns contend it was a meeting to discuss the future of the management agreement. Mr. Brown stated he gave Mrs. Higashi several options, including having Mrs. Higashi continue to manage the store. He claims to have left the meeting allowing Mrs. Higashi and her brother to propose a new deal.

Mrs. Higashi claims that Mr. Brown's first comment to her at this meeting was that "[your] lease [is] terminated." Mrs. Higashi thought he meant the rent on the building where the liquor store was located, and that she was losing her place of business. She started crying, was upset, and felt like it was a "real blow."

Mr. Brown returned to Snohomish. On November 6, 1992, the Browns learned that Mrs. Higashi had signed a management contract with a competitor and was moving the liquor store's inventory to the competing store. Mrs. Higashi claims that because she thought the liquor store's lease of the Browns' building was terminated, she was looking for a new place to run her business.

Mr. Brown fired Mrs. Higashi, and telecopied a demand that she leave the premises. When she left, she padlocked the door to the store. NCC sued to enjoin her from barring access to the store. The superior court denied a temporary restraining order and scheduled a preliminary injunction hearing for November 20, 1992. NCC withdrew its motion after "peaceably" securing access. Mrs. Higashi testified that Mr. Brown changed the locks over her protest. She wanted to avoid the use of force and leave the decision to the court so she did not fight Mr. Brown. She never got back into the building.

NCC sued for an accounting of the management fee. Mrs. Higashi counterclaimed for damages. She alleged fraud if the Browns sold the liquor store with no intent to sign over the license.

The case went to trial. NCC and the Browns moved for a directed verdict on all counts. The judge granted a directed verdict in favor of the Browns on Mrs. Higashi's claim for negligent accounting services, and denied the motion as to all other counts. The jury returned its verdict, awarding Mrs. Higashi $1,188,709.00, and ownership of NCC's bank account. NCC and the Browns moved for a judgment notwithstanding the verdict. This was denied. They appeal.

### B. *NCC v. NBA*

NCC opened its operating account at NBA. The Browns signed a "signature card." The bank was provided with copies of NCC's

Articles of Incorporation and Bylaws, as well as NCC's taxpayer identification number.

In 1989 the Browns signed a second signature card, adding the Higashis as signators to the account. On July 28, 1992, the Higashis signed a third signature card, removing the Browns as signators, and adding their son. NBA did not notify the Browns of this change.

NBA deleted NCC's taxpayer identification number on the account, and replaced it with the Higashis' personal number. Mrs. Higashi signed the card as "secretary/certifying officer." NBA did not ask for corporate records or minutes. The Higashis' taxpayer identification number is crossed out on the card, but the previous number is not reinstated.

Mr. Brown affied that he would not have permitted this change to occur if NBA had informed him at that time. However, he did not discover the change until Mr. Higashi's death. He returned to Nome to help manage the business while Mrs. Higashi was attending her husband's funeral; he inquired about the balance in his account. An account clerk informed him he was no longer on the account.

When Mrs. Higashi returned to Nome, she and Mr. Brown went to NBA and filled out a fourth signature card, eliminating the Higashis' son (although Mr. Brown still did not know he was on the account), and adding Mr. Brown. Mr. Brown instructed a bank clerk that Mrs. Higashi did not have authority to change the account, and that the bank should not permit any more changes without Mr. Brown's approval. Corporate documentation was neither provided by Mr. Brown, nor requested by the bank.

When Mr. Brown found out that Mrs. Higashi was transferring inventory to another store, he called the bank and requested that the account be frozen. The bank agreed to do so if a confirming letter was received. Mr. Brown provided the letter.

Mrs. Higashi also called the bank the same day, asking to remove the funds from the account, and to open a new account with those funds. The bank refused.

Three days later, Mr. Brown attempted to "unfreeze" the account. The bank refused, requesting documents to show why Mrs. Higashi should not retain authority over the account.

NBA's Anchorage office told the Nome branch to ask for corporate documentation which could give NBA the authority to unfreeze the NCC account. Mr. Brown provided NBA with a corporate resolution; Mrs. Brown provided corporate Bylaws. The Browns were then requested to provide a corporate seal. The account was never unfrozen.

The Browns were unable to deposit large amounts of cash that accumulated as a result of the operation of the liquor store. The cash on hand approached $60,000. NBA dishonored a check written by Mr. Brown to cover NCC expenses after November 6, 1992. Mr. Brown did not write another check because he felt that to do so would be useless.

On November 18, 1992, a bank manager wrote in a memorandum that he had "heard many rumours of the working agreement between the Higashis and the Browns as the Higashis were the working managers." On November 18, 1992, Mrs. Higashi's attorney sent NBA the following letter:

> The Nome Liquor Store bank account is owned by my clients, Mr. and Mrs. Higashi. I am hereby notifying the Bank that if any money is disbursed from the account without my clients' written consent or a court order directing its disbursement, my clients and I will be looking to recover all losses they incur as a result of such disbursement from the National Bank of Alaska.
>
> I will be glad to discuss this matter with the Bank's attorney. If you wish to avoid any problems, I would request that the funds be interpleaded into the court in Nome in Case 2NO–92–250 Civil. Thank you for your attention regarding this matter.

Shortly thereafter, Mr. Brown's attorney wrote NBA a letter stating that "this is not a case for interpleader" and provided documents that the Browns' attorney "hope[d] [would be] sufficient to allow Wayne Brown to unfreeze the account that he froze, and to

sign new signature cards on which he [and Mrs. Brown] would be the sole signators."

The Browns contend that NBA then "embarked on a campaign of retribution against NCC and the Browns." NBA refused to let the Browns open personal accounts, deposit cash into the accounts of NCC's vendors, buy bank checks or cashier's checks, or convert bills to change. Mrs. Higashi was allowed to continue using NBA for all her personal banking.

On December 21, 1992, NBA filed an interpleader action. NCC and the Browns counterclaimed for damages. NBA was granted either a summary judgment or a directed verdict on all of NCC's and the Browns' claims. NCC and the Browns appeal.

## III. DISCUSSION—NCC v. Higashi

### A. The Evidence Does Not Support a Finding that the Browns Sold the Liquor Store to the Higashis.

■ We review the grant or denial of a directed verdict or a judgment notwithstanding the verdict by determining "whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment as to the facts." *Ben Lomond, Inc. v. Schwartz,* 915 P.2d 632, 635 (Alaska 1996); *ARCO Alaska, Inc. v. Akers,* 753 P.2d 1150, 1154 (Alaska 1988).

■ Reasonable jurors could not find that the Browns had agreed to sell the liquor store. All of the documentary evidence supports the Browns' position that the parties had entered into a management agreement. Mr. Brown informed the vendors that the Higashis were the new managers, and continued to personally guarantee all liquor purchases. The Browns had access to the store's bank account after the time Mrs. Higashi alleges the sale was completed. Mrs. Higashi permitted Mr. Brown to reinstate his authority over the account in 1992 without objection. The Higashis made several sworn statements that the Browns continued to own the store. NCC's and the Browns' income tax returns reflect the fact that they were the store's owners.

Mrs. Higashi finds support in the statement contained in the notes of the Cabo San Lucas meetings that the parties "agreed to proceed with the drafting of a long term lease which when executed would also cause the liquor license to be transferred in compliance with applicable state law." While this could suggest that the parties had entered into an agreement to sell the liquor store in 1989, it could also be interpreted to support Mr. Brown's contention that the parties discussed the sale of the store in 1991, a couple of years after Mrs. Higashi contends she and her husband had already purchased the store. Regardless of how the statement is interpreted, it is not enough to contradict the overwhelming evidence to the contrary.

The remaining evidence is the conflicting testimony of the parties. The Browns testified that the parties entered into a management agreement. Mrs. Higashi testified that she and her husband purchased the store on December 1, 1989, and had completed their end of the bargain as of September 1990. The documentary evidence directly contradicts this assertion. The Higashis themselves made several sworn statements after these dates that the Browns were the sole owners of the liquor store. The Higashis never asserted an ownership interest in the store prior to the instant litigation, although there were several instances where one would expect an owner to object to a non-owner's assertion of ownership.

On balance, we conclude that the documentary evidence is compelling. Reasonable jurors could not conclude that the Higashis purchased the store on December 1, 1989. We remand the case with instructions to the superior court to enter a directed verdict in favor of NCC and the Browns.

### B. Mrs. Higashi Cannot Recover Damages for Intentional Infliction of Emotional Distress.

■ "An actor is never liable ... where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress." Restatement (Second) of Torts § 46, comment g (1964); *see also Woods v. ABC Ins. Co.,* 580

So.2d 480, 481 (La.App.1991) (holding eviction for non-payment of rent is proper and not a valid basis for an intentional infliction of emotional distress claim).

Since the Browns did not agree to sell the store to the Higashis, Mrs. Higashi's contractual rights to run the store ended upon her husband's death. The Browns cannot be held liable for emotional distress suffered by Mrs. Higashi. The Browns were legally entitled to inform her that the contract with her husband ended upon his death, and to protect their interests regarding the management of their store. We reverse, and instruct the superior court to enter a directed verdict in favor of the Browns.[4]

## IV. DISCUSSION—NCC v. NBA

### A. An Interpleader Is Appropriate Even Where the Stakeholder May Be Independently Liable to a Claimant.

A threshold question in this case is whether NBA was entitled to file an interpleader. We answer in the affirmative.

Both the Browns, as owners of NCC, and Mrs. Higashi assert that they are entitled to the funds in the account. NBA therefore may be subject to "double or multiple liability." This satisfies the requirements for an interpleader under Civil Rule 22.[5]

Although the requirements of Civil Rule 22 were satisfied, the superior court apparently was of the view that an additional prerequisite must be met before an interpleader action may be filed. The superior court cited *Arizona Bank v. Wells Fargo Bank, N.A.,* 148 Ariz. 136, 713 P.2d 337 (App.1985), for the proposition that, in order to maintain an interpleader action, the stakeholder must not

---

**4.** At oral argument, the Browns abandoned their appeal on their claim for accounting fees.

**5.** Civil Rule 22 provides:

Persons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability. It is not ground for objection to the joinder that the claims of the several claimants or the titles on which their claims depend do not have a common origin or are not identical but are adverse to and independent of one another, or that the plaintiff avers

have incurred independent liability to any claimant.

The case cited by the superior court exemplifies the traditional view that there are four requirements for filing an interpleader:

1. The same thing, debt, or duty must be claimed by both or all the parties against whom the relief is demanded; 2. All their adverse titles or claims must be dependent on or be derived from a common source; 3. The person asking the relief—the plaintiff—must not have or claim any interest in the subject-matter; 4. He must have incurred no independent liability to either of the claimants; that is, he must stand perfectly indifferent between them, in the position merely of a stakeholder.

7 Wright et al., *Federal Practice and Procedure* § 1701 (2d ed.1986). Civil Rule 22 expressly eliminates the first three of these requirements.

Whether Civil Rule 22 has eliminated the "no independent liability" requirement is a question of first impression in Alaska, and other courts differ in their treatment of this issue. Wright, *supra* at § 1706.[6] Wright points out that "[c]ontemporary procedure ... is well adapted to disposing of interpleader cases even when independent liability is asserted. Thus, there is no reason today ... for continuing to honor a limitation on the remedy that has no claim to validity other than that it is old." *Id.* We agree, and join the courts that have held that Civil Rule 22 eliminates the requirement that the stakeholder not be independently liable to a claimant. *See Olivier v. Humble Oil & Ref. Co.,* 225 F.Supp. 536, 539 (E.D.La.1963).

that the plaintiff is not liable in whole or in part to any or all of the claimants. A defendant exposed to similar liability may obtain such interpleader by way of cross-claim or counterclaim. The provisions of this rule supplement and do not in any way limit the joinder of parties permitted in Rule 20.

**6.** Because Civil Rule 22 is identical in relevant respects to Federal Civil Rule 22, federal cases are persuasive on this issue. *Johnston v. All State Roofing & Paving Co.,* 557 P.2d 770, 773 n. 7 (Alaska 1976).

### B. An Innocent Stakeholder Is Not Liable for Damages Caused by Interpleading Disputed Funds.

■ As mentioned above, the superior court in this case held that a stakeholder may not be held liable for damages that occur after an interpleader action is filed.

■ The superior court's holding was incorrect inasmuch as it implies that an interpleader is a defense to independent claims against the stakeholder. It is not the function of the interpleader rule to bestow upon a stakeholder immunity from liability for damages that (1) are unrelated to the act of interpleading, but (2) happen to occur after an interpleader action is filed. In the present case, NCC claims damages for negligence, breach of contract, and breach of fiduciary duty. The alleged actions giving rise to these claims—mishandling the signature cards and failing to give notice to signators—occurred many months in advance of any competing claims to the funds. These claims are not based upon the decision to file an interpleader, and are not deficient on account of the interpleader.

■ However, the superior court was correct to the extent that it was holding that a claimant may not seek to recover from an innocent stakeholder damages caused by the stakeholder's filing of an interpleader. Civil Rule 22 permits a stakeholder to interplead funds whenever the stakeholder may be exposed to "double or multiple liability." A stakeholder who reasonably and in good faith believes that there are adverse claims to the fund cannot be held liable for invoking the protections of Civil Rule 22. A contrary result would defeat the purpose of the interpleader rule: to protect the innocent stakeholder from multiple liability. *See Johnston v. All State Roofing & Paving Co.*, 557 P.2d 770 (Alaska 1976) (holding interpleader rules should be liberally construed); *see also*

Wright, *supra* at § 1702 (purpose of interpleader is to protect stakeholder). NCC's claims for conversion and wrongful dishonor seek damages caused by NCC's inability to access its funds due to the fact that NBA decided to interplead the account. NCC may not recover under these theories.

### C. NBA Was Entitled to File an Interpleader; Mrs. Higashi Was Not an "Adverse Claimant" under AS 06.05.145.

■ NCC argues that, even if a stakeholder cannot be liable for damages caused by interpleading funds of disputed ownership, NBA can be held liable in the present case because NBA did not follow the requirements of AS 06.05.145.[7] NBA asserts that AS 06.05.145 does not apply to this case, as Mrs. Higashi is not an adverse claimant to the account. NBA is correct.

NBA was not faced with a situation in which a stranger to the account was disputing the account holder's right to receive its money. Instead, the Browns and Mrs. Higashi both claimed an ownership interest in the company named on the account. Mr. Brown and Mrs. Higashi were both authorized signators of the account. It was not clear to NBA who represented NCC, dba Nome Liquor Store, and who was the adverse claimant. "Had [NBA] guessed wrong and invoked the [adverse claim] statute against the wrong party, it still could have incurred liability." *First Union Nat'l Bank of South Carolina v. FCVS Communications, VSC*, 321 S.C. 496, 469 S.E.2d 613, 617 (App.1997), *cert. granted*, March 5, 1997; *see also AARTS Prods., Inc. v. Crocker Nat'l Bank*, 179 Cal.App.3d 1061, 225 Cal.Rptr. 203, 208 (1986) (following majority rule that a named depositor is not an "adverse claimant" to account). NBA's decision to file an interpleader was appropriate under the circumstances of this case.

7. AS 06.05.145 states:
 Notice to a bank of an adverse claim to a deposit standing on its books to the credit of a person is ineffective unless the adverse claimant procures a restraining order, injunction or other appropriate process against the bank from a court in a cause where the person to whose credit the deposit stands is made a party

or executes to the bank in form and with sureties acceptable to it a bond, indemnifying the bank from any liability, loss, damage, costs and expenses on account of the payment of the adverse claim or the dishonor of the check or other order of the person to whose credit the deposit stands on the books of the bank.

NCC's claim for conversion is unfounded, and summary judgment was correct. Since the wrongful dishonor claim is premised on a check presented to the bank after the bank was aware of the competing claims to the account, summary judgment in favor of NBA on this aspect of this case was correct.

D. *The Superior Court Erred in Entering a Directed Verdict against NCC for Its Breach of Contract, Breach of Fiduciary Duty and Negligence Claims.*

The superior court entered a directed verdict against NCC on its independent claims, relying upon a lack of evidence of any damages caused by these legal theories. However, NCC was prevented from presenting damage evidence. The superior court ruled that the bank could not be liable for damages claimed for the bank's acts after November 5 or 6, 1992, because *Johnston v. All State Roofing & Paving Co.*, 557 P.2d 770 (Alaska 1976), prevents claimants from recovering for damages caused by filing an interpleader.

NCC's complaint does seek to recover for damages caused by filing the interpleader. However these damages do not, according to NCC's complaint, arise from the interpleader, but from NBA's breach of contract, breach of fiduciary duty, and negligence. NCC claims that, but for NBA's actions, there would be no competing claims to the funds in the account, and therefore no need to interplead.

NCC presented evidence that the bank did not follow proper banking procedures, and did not follow the requirements of its contract with NCC. NCC claims NBA permitted the Higashis to delete the Browns from NCC's account without documentation, and without notifying the Browns. The account agreement states, "All persons authorized by the account to have access to the account of any corporation or unincorporated association must notify the bank in writing of any change in the corporate officers that would affect the terms of the contract."

The superior court erred by directing a verdict on these claims for the reasons expressed above in Part IV.B. NBA cannot be held liable for damages that were caused solely by NBA's decision to interplead the funds. NBA can be liable for damages resulting from the interpleader if NCC proves NBA breached a duty which created the basis that permitted NBA to interplead the funds.

E. *The Superior Court Did Not Err in Directing a Verdict against NCC's Claims for Breach of the Duty of "Good Faith".*

We have previously indicated that a claim for a breach of the implied covenant of good faith and fair dealing in ordinary commercial contracts sounds only in contract. *State, Dep't of Natural Resources v. Transamerica Premier Ins. Co.*, 856 P.2d 766, 774 (Alaska 1993). Insurance contracts, because of the special relationship between the insurer and the insured, justify an action in tort for such a breach. *Id.*

NCC states, "Breach of this covenant should be actionable in tort against banks, just as it is against insurers," citing *State Farm Fire & Casualty Co. v. Nicholson*, 777 P.2d 1152 (Alaska 1989). NCC makes no further argument why a cause of action in tort should be extended to such contracts. NCC's argument does not persuade us that the relationship between a bank and its depositor justifies creating a tort action for the breach of the implied covenant of good faith and fair dealing.

F. *The Superior Court Did Not Err in Granting Summary Judgment for NBA against the Browns' Individual Claims.*

The Browns counterclaimed against NBA, claiming damages for negligent or intentional infliction of emotional distress, and for damages arising out of liquidating personal assets to fund the Nome Liquor Store. The superior court entered summary judgment against the Browns.

1. *The superior court did not err in granting summary judgment against the Browns on their claims for damages caused by liquidating their assets to protect the store.*

The Browns' answer asserts that "NBA's improper actions in freezing the ac-

count of Nome Commercial Company required the Browns to liquidate investments to fund company operations. NBA should be liable for all damages proximately caused thereby." NBA moved for summary judgment on this claim, arguing that "a shareholder has no personal or individual right of action against third parties for acts which result in injury to their corporation." *Arctic Contractors, Inc. v. State,* 573 P.2d 1385, 1386 (Alaska 1978).

In their memorandum in opposition to summary judgment, the Browns argued that they were seeking damages for injuries caused to them personally. They stated, "When the Browns were required to liquidate their own investments and fall back on their personal resources, the damage was caused to them individually. Nome Commercial Company itself might have had to borrow all of the personal resources of the Browns to remain in operation, while arguably not incurring a loss in doing so." On appeal, they argue, "The Browns have no quarrel with the proposition that shareholders may not sue for damage to their corporation. NCC, however, was not damaged by seizure of its bank account, to the extent it was able to borrow money from the Browns."

The Browns have failed to set forth specific facts showing that NBA is not entitled to summary judgment. *Alvey v. Pioneer Oilfield Serv.,* 648 P.2d 599, 600 (Alaska 1982). Specifically, the Browns have failed to indicate that they suffered any damages, other than damages for emotional distress, that cannot be recovered in an action by their corporation, and for which NCC is not already seeking redress. If NCC borrowed money from the Browns as a result of NBA's negligence or breach of contract, NCC would presumably be obligated to repay the loan with interest. NCC, in turn, would be able to recover from NBA any finance charges it incurred as a result of its loan from the Browns. Accordingly, the fact that the Browns lent NCC money does not entitle the Browns to recover from NBA. The Browns failed to present any evidence that would be admissible at trial of any other damages. Summary judgment was correct against the Browns on this claim. Alaska Civil Rule 56.

2. *The superior court did not err in entering summary judgment against the Browns on their claims for negligent and intentional infliction of emotional distress.*

a. *Negligent infliction of emotional distress*

 The Browns are seeking to recover for negligently inflicted emotional distress. This claim fails. To recover for negligent infliction of emotional distress, either the defendant must owe a preexisting duty to the plaintiff, or the plaintiff must have suffered physical injury. *Chizmar v. Mackie,* 896 P.2d 196, 203 (Alaska 1995). The Browns have not asserted that they were physically injured in any way.

██ The preexisting duty may arise from a contractual relationship. *Id.* However, ordinary contracts do not give rise to such a duty; the only contracts that will are those that are "highly personal and laden with emotion" such as "contracts to marry, to conduct a funeral, to sell a sealed casket, to conduct a cesarean birth, [or] to surgically rebuild a nose." *Id.* (quoting *Hancock v. Northcutt,* 808 P.2d 251, 258–59 (Alaska 1991)). A contract between a bank and its customer is not the kind of contract that is "highly personal and laden with emotion." Thus, negligent infliction of emotional distress will not lie absent physical injury. *See id.* The superior court did not err in granting summary judgment against the Browns on this claim.

b. *Intentional infliction of emotional distress*

 To recover damages under intentional infliction of emotional distress (IIED), the plaintiff must show severe injury. *Cameron v. Beard,* 864 P.2d 538, 548 (Alaska 1993). The superior court must determine as a threshold matter whether the severity of the emotional distress is sufficient to submit a claim for IIED to the jury. *Chizmar,* 896 P.2d at 208. The court's determination will not be overturned absent an abuse of discretion. *Id.* at 209.

The Browns point solely to a statement in Mr. Brown's affidavit that NBA's refusal to allow them to open an account "caused Carrol and me great concern for our physical safety." The court was not presented with any further evidence of emotional harm. The court did not abuse its discretion in directing a verdict against the Browns for this claim.

## V. CONCLUSION

We REVERSE and REMAND with instructions to the superior court to enter a directed verdict against Mrs. Higashi as to all her claims. We AFFIRM the superior court's disposal of NCC's claims against NBA for conversion and wrongful dishonor and breach of the implied covenant of good faith and fair dealing. We REVERSE the superior court's directed verdict against NCC for its claims of breach of contract, breach of fiduciary duty, and negligence. We AFFIRM the dismissal of the Browns' personal claims against NBA.